1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   HAYWARD LEE MAYHAN,                 )   Case No.  1:14-cv-01691-DAD-JLT
                                         )
12                  Petitioner,          )   FINDINGS AND RECOMMENDATIONS TO
                                         )   DENY PETITION FOR WRIT OF HABEAS
13          v.                           )   CORPUS
                                         )    (Doc. 1)
14   CONNIE GIPSON,                      )
                                         )
15                  Respondent.          )   ORDER DIRECTING THAT OBJECTIONS BE
                                         )   FILED WITHIN TWENTY DAYS
16                                       )
                                         )
17   _____)

18          In 2009, a jury convicted Hayward Mayhan of attempted murder, attempted murder of a public

19   official, assault with a deadly weapon by a prisoner and other crimes.  The trial court sentenced him to

20   a prison term of 91-years to life.  In this action, he contends the Court should grant his habeas petition

21   for many reasons including errors he contends the trial court committed and ineffective assistance of

22   trial counsel among other claims.  The Court concludes Petitioner has failed to demonstrate

23   entitlement to relief and recommends the petition be **DENIED**.

24   **I.       PROCEDURAL HISTORY**

25          In 2009, a jury convicted Petitioner of attempted murder with premeditation, attempted murder

26   of a public official, assault with a deadly weapon by a prisoner battery by a prisoner on a non-confined

27   person and custodial possession of a weapon. (Doc. 17, Ex. A ("Ex. A"), p. 2)  The trial court

28   sentenced him to an indeterminate term of 91-years-to-life. The jury also found true the allegations

1    that Petitioner had suffered three prior strike convictions, had served two prior prison terms and had

2    suffered three prior serious felony convictions.  (Id.)

3         Petitioner appealed to the California Court of Appeals, Fifth Appellate District (the "5th

4    DCA"), which conditionally reversed the judgment and found the trial judge erred in denying one of

5    Petitioner's motions for new counsel.  (Ex. A, p. 18)   The court remanded the case to the trial court to

6    conduct a new Marsden hearing on substitution of counsel.  The 5th DCA ruled that if the trial court

7    denied the motion, it should reinstate the judgment. (Id.)   If it granted the motion, the judge should

8    appoint new counsel and proceed accordingly.  (Id.)  The court also ordered that upon reinstatement of

9    the conviction, the superior court should enter a minute order reflecting several corrections to the

10   sentence discussed in the 5th DCA's opinion.  (Id.) Petitioner then filed a petition for review in the

11   California Supreme Court that was summarily denied.  (Lodged Document ("LD") 35)

12        Upon remand, the superior court conducted a new Marsden hearing (Doc. 17, Ex. B ("Ex. B"),

13   p. 22) and denied the Marsden motion.  (Id.)  Petitioner appealed again but the 5th DCA affirmed the

14   superior court's ruling.  (Id.)  Petitioner's subsequent petition for review in the California Supreme

15   Court was denied. (LD 50)

16   **II.     FACTUAL BACKGROUND**

17        The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

18   On October 15, 2006, while working in the security housing unit at Corcoran State Prison,
     Correctional Officers Thom Hieng and Frank Braswell attempted to serve appellant, an inmate,

19   dinner in his cell.  Normally, the food tray is passed into the food port and the inmate takes the
     food tray and eats it at his bunk.  But after Officer Braswell put appellant's food tray on the

20   food port, appellant lunged forward and shoved the tray out of the food port door, bruising
     Officer Hieng's thumb in the process.  Appellant then stuck a "long stick," an inmate-

21   manufactured spear, out of the food port and thrust it several times within an inch or two of
     Hieng's neck and face.  Braswell moved toward Hieng, and appellant then shoved the spear

22   several times towards Braswell's chest area.  Hieng ordered appellant to "pull back" several
     times, but appellant did not comply.  Hieng then pepper-sprayed appellant and appellant pulled

23   his arm and the weapon back into his cell.

24   Officer Braswell closed appellant's food port and called for backup.  Another officer instructed
     appellant to put his hands into the food port so that he could be handcuffed. Appellant did not

25   initially comply.  Once he did, he was taken to be decontaminated from the pepper spray.
     A search of appellant's cell revealed a spear, about two feet long, near appellant's mattress.

26   The shaft of the spear was constructed of tightly rolled newspaper or magazines and wrapped

27

28   _____
     [1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
     Thus, the Court adopts the factual recitations set forth by the 5th DCA.

in cloth or sheet material.  The tip of the spear was a state-issued toothbrush that had been sharpened to a point.

**The Defense**

Appellant testified on his own behalf that "[a]n incident did occur, I guess it was an ongoing incident prior to that lead up to the incident."  According to appellant, in the months prior to the incident, he had been treated inhumanely and with disrespect by correctional officers, specifically by Officer Braswell.  He had not been fed "for weeks at a time at dinnertime," and rocks and bleach had been put in his food.  He had been housed with inmates who had AIDS, HIV, and hepatitis C.  He had been beaten and physically abused.  His attempts to resolve these problems through the inmate grievance system had produced no result.  On the day in question, appellant was "fed up," "tired" and "starving."

Appellant testified that he was "not saying that an incident didn't happen, but [he had] tried to resolve it in so many different ways," including asking to be moved and filing inmate complaints.  What he was trying to do on the day of the incident was make the officers stop the harassment.  He admitted having made the spear with a sharp point, though he claimed the toothbrush point was not the point he used.  He denied trying to kill Officer Hieng during the incident or even trying to stab him.  It was Officer Braswell he tried to stab.  He explained: "If that is what it took to let him know to stop treating me the way he was treating me then I guess."  "As far me trying to premeditate, kill somebody or hurt somebody, you don't think like that when you are put in a position to just—you just don't want to be bothered ... and that is just the way life is, that is the way we live."

On cross-examination, appellant acknowledged that he had been in the security housing unit for six-and-a-half to seven years, initially for conspiracy to murder a correctional officer.  After he was found not guilty of that offense, he remained because he was a threat to the "safety and security of these officers."

(Ex. A, pp. 2-3)

## III.   DISCUSSION

### I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds*

1   by Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's

2   enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed

3   by its provisions.

4          II.       Legal Standard of Review

5          A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the

6   petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was

7   contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

8   by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an

9   unreasonable determination of  the facts in light of the evidence presented in the State court

10  proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S.

11  at 412-413.

12         A state court decision is "contrary to" clearly established federal law "if it applies a rule that

13  contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

14  that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

15  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

16         In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

17  explained that an "unreasonable application" of federal law is an objective test that turns on "whether

18  it is possible that fairminded jurists could disagree" that the state court decision meets the standards set

19  forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of

20  federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct.

21  1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court

22  "must show that the state court's ruling on the claim being presented in federal court was so lacking in

23  justification that there was an error well understood and comprehended in existing law beyond any

24  possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

25         The second prong pertains to state court decisions based on factual findings.  Davis v.

26  Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a

27  federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted

28  in a decision that was based on an unreasonable determination of the facts in light of the evidence

4

presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

### III.    Review of Petitioner's Claims

Petitioner alleges the following as grounds for relief: (1) exclusion of defense witnesses; (2) failure of trial judge to re-initiate competency hearing when counsel expressed competency concerns ; (3) denial of Marsden motions; (4) ineffective assistance of trial counsel in allowing Petitioner to testify in narrative form; (5) instructional error; (6) cumulative error; and (7) sentencing error.

#### A.    Exclusion of Defense Witnesses

Petitioner first contends that the trial court effectively prevented him from presenting his defense by excluding various inmates whom Petitioner wished to testify on his behalf.

##### 1.    The 5th DCA's Opinion

The 5th DCA rejected Petitioner's claim with the following reasoning:

> Appellant contends the trial court denied him due process, a fair trial, the right to confront and impeach witnesses, and to present a defense when it refused to allow four prison inmate witnesses testify.  He contends the witnesses would have supported his testimony that he had been harassed and abused by the correctional officers.  He also contends that the trial court's ruling compelled him to take the stand and testify.  We reject appellant's arguments.

///

**Procedural background**

On October 30, 2008, prior to trial, the court granted a defense motion seeking to transport two inmate witnesses, Curley Broussard and Shawn Fisher, to trial on December 2, 2008.  On November 12, 2008, during appellant's second Marsden hearing, appellant complained that defense counsel had informed him he was only allowed a limited number of witnesses.  Appellant insisted there were four more inmate witnesses, in addition to the five already subpoenaed, he wanted counsel to investigate who were either in the vicinity when the attack occurred or had "had issues" with the officers involved.

On December 1, 2008, defense counsel filed his witness list for trial, consisting of Broussard and Fisher as well as two additional inmate witnesses: Shannon Bell and Elrador Browning.  On December 3, 2008, after the court denied appellant's third Marsden motion, but prior to the introduction of evidence, the prosecutor made a motion to exclude the testimony of all four inmate witnesses.  As argued by the prosecutor and left uncontradicted by the defense, investigative reports regarding the prospective witnesses showed that none of the inmates were percipient witnesses to the attack and their statements contained only hearsay on "how bad the prison is and how they picked on [appellant.]"  In addition, the officers named in the investigative reports were not the officers involved in the incident at issue.

Defense counsel acknowledged that none of the inmate witnesses had witnessed the attack, but stated that the witnesses would testify in support of appellant's contention that he had been abused "on a number of occasions by officers which ... would [further appellant's] justification [issue] for any actions he may have taken ."

The trial court ruled tentatively that it would not allow the inmate witnesses to testify because their testimony could not provide a legal defense to appellant's actions.  The court explained it would reconsider its ruling after it had heard some of the evidence, but warned that "given the nature of the case, given the possible legal defenses the Court does not see how they could be relevant in this matter."

Following appellant's testimony, defense counsel asked the trial court for a "further ruling" based on the evidence presented.  The prosecutor argued that the inmate witnesses' testimony was "still not relevant," was hearsay, was vague as to time frame, did not include the officers involved, and had no relevance to the current proceeding.  The court again refused to allow the inmate witnesses to testify, finding none of the elements of a necessity defense were present to make the testimony of the proposed witnesses relevant.

**Applicable law and analysis**

Preliminarily, we note respondent's assertion that appellant failed to raise his Sixth Amendment claim below and has therefore forfeited the issue on appeal.  Generally, "questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." (People v. Rogers (1978) 21 Cal.3d 542, 548.)  For present purposes, however, we will assume that appellant preserved the Sixth Amendment issue for appeal by arguing to the trial court that the inmates' testimony was vital to appellant's defense.  We will conclude, nonetheless, that the exclusion of the proffered testimony did not violate appellant's constitutional rights.  Neither did the trial court prejudicially err in finding the proffered evidence irrelevant.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (Crane v. Kentucky (1986) 476 U.S. 683, 690.)  As a general matter, however, the application of the ordinary rules of evidence does not impermissibly infringe on a defendant's due process right to present a defense. (People v. Snow (2003) 30 Cal.4th 43, 90.)  Indeed,
"[a] defendant's right to present [even] relevant evidence is not unlimited, but rather is subject to reasonable restrictions. [Citations] A defendant's interest in presenting such

6

evidence may thus "'"bow to accommodate other legitimate interests in the criminal trial process."'" [Citations.]" (<u>United States v. Scheffer</u> (1998) 523 U.S. 303, 308, fn. omitted.)

Evidence Code section 350 provides: "No evidence is admissible except relevant evidence." Evidence Code section 210 defines relevant evidence as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The California Supreme Court has stated evidence is relevant if it "tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." (<u>People v. Garceau</u> (1993) 6 Cal.4th 140, 177, abrogated on another ground as stated in <u>People v. Yeoman</u> (2003) 31 Cal.4th 93, 117.)

"The trial court has broad discretion in determining the relevance of evidence [citations], but lacks discretion to admit irrelevant evidence. [Citations.]" (<u>People v. Crittenden</u> (1994) 9 Cal.4th 83, 132.) The trial court also has broad discretion to limit the introduction of evidence that, while relevant, is of limited probative value. (Evid.Code, § 352.)

A trial court's determination whether evidence is relevant or has sufficient probative value to be admitted is reviewed for abuse of discretion. (<u>People v. Sanders</u> (1995) 11 Cal.4th 475, 554–555; <u>People v. Jennings</u> (2000) 81 Cal.App.4th 1301, 1314.) We reverse only if the trial court's ruling was "'arbitrary, whimsical, or capricious as a matter of law. [Citation.]'" (<u>People v. Branch</u> (2001) 91 Cal.App.4th 274, 282.)

We conclude first that the exclusion of the inmate witnesses' testimony did not violate appellant's constitutional right to present a defense. As we have noted above, the application of ordinary rules of evidence does not impermissibly infringe a defendant's constitutional right to present a defense. (<u>People v. Snow, supra</u>, 30 Cal.4th at p. 90.) Appellant was not denied the opportunity to present his defense. He gave his testimony and his attorney did with it what he could.6 If the trial court was correct in ruling the proffered additional testimony irrelevant, then obviously no constitutional error occurred. If, instead, the trial court erred in that conclusion, it is nonetheless true that appellant was allowed to present his defense. That he was not allowed to support that defense with the testimony of nonpercipient witnesses simply did not rise to the level of a constitutional violation. (<u>Cf. People v. Fudge</u> (1994) 7 Cal.4th 1075, 1103 [excluding defense evidence on minor or subsidiary point does not impair accused's due process right to present a defense].)

Second, we conclude that the trial court was correct in ruling the proffered evidence inadmissible. The gravamen of appellant's defense was that correctional officers at the prison, specifically Officer Braswell, treated him inhumanely and he responded by using force to get them to "leave [him] alone." But appellant did not testify that he acted in self-defense on the day of the attack, or even that anything untoward had occurred to provoke him on that particular day. As we conclude post, appellant's necessity defense was ill-founded. His testimony, that is, did not make out a necessity defense. We also conclude post that appellant's testimony did not make out a provocation defense. Further, none of the proffered inmate witnesses had actually witnessed the attack and thus, at most, they could have testified in support of appellant's misguided defense.

Neither do we accept appellant's contention, made for the first time here, that the proffered evidence was "relevant on a host of intent issues (including the credibility of appellant's testimony he lashed out without intent to kill), as well as defenses to felony assault, all of which defense counsel argued [below]." First, appellant did not testify that he did not intend to kill—just that he did not intend to kill Officer Hieng. His testimony about his intent as to Officer Braswell was ambiguous on this question. He did directly admit that he intended to stab Officer Braswell. But, as to attempting to kill him, he said, "No, but I—I was trying to make a statement that, you know, stop him from doing what he was doing to me, you know, I wasn't thinking like that. I mean, I can't tell you at the time how I was feeling." Further, that

appellant was upset, even desperate, because of officer abuse simply does not show that he did not intend to kill. (Cf. CALCRIM No. 603 [provocation defense does not negate intent to kill, it merely mitigates offense to attempted voluntary manslaughter and intent to kill is still an element].) And appellant's motivation to make the officers leave him alone and stop the abuse was not sufficient to mitigate his crime to voluntary manslaughter. (§ 192, subd. (a); People v. Steele (2002) 27 Cal.4th 1230, 1252–1253.) Finally, as to "defenses to felony assault," we fail to see how the proffered evidence or appellant's testimony, if accepted as true, has any relevance. Appellant makes the assertion that it does, but he does not elaborate. We thus reject his unsupported conclusion. (People v. Hardy (1992) 2 Cal.4th 86, 150 [declining to address issue presented by appellant without "either argument or citation to relevant authority"].)

Again for the first time here, appellant's opening brief mentions (almost in passing) that the proffered evidence would have supported his claim that he did not premeditate any attempt to kill Officer Hieng. But appellant made no such claim. He testified not that he did not premeditate but that he did not intend to kill Officer Hieng. His testimony as to premeditation and any intent to kill Officer Braswell was ambiguous. Further, even if the proffered evidence might have had some probative value on the question of premeditation, we believe its exclusion was not prejudicial. It was, after all, only supporting evidence at best. And any inference to be drawn from appellant's testimony, indicating lack of premeditation, was contradicted by the evidence that appellant made a two-foot long spear out of tightly wrapped paper covered with some sheet-like material, attached a sharp pointed end, waited until a meal was served to him, and then thrust the spear out of a port in his cell door at the face and neck area of the person he thought was Officer Braswell, his enemy. There is, we think, no reasonable probability that allowance of the proffered inmate testimony would have changed the result regarding premeditation. (People v. Boyette (2002) 29 Cal.4th 381, 427–428 [test from People v. Watson (1956) 46 Cal.2d 818, 836, is proper standard of review for erroneous exclusion of evidence].)

Finally, we reject appellant's claim that the court's ruling compelled him to take the witness stand only to be impeached with an array of prior felony convictions. As noted by respondent, during a Marsden hearing on December 3, 2008, even before the prosecutor made the motion to exclude the testimony of the inmate witnesses, defense counsel indicated that appellant had already decided to testify on his own behalf. And at that same hearing, appellant later confirmed on the record that he intended to testify. Thus, the record does not support his contention that he felt compelled to testify once the trial court ruled that the inmate witnesses were not allowed to testify.

We conclude no prejudicial error occurred.

(Ex. A, pp. 3-5)

## 2.    Federal Standard

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. 62, 68, 112 S.Ct. 475, 477 (1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), cert. denied, 478 U.S. 1021 (1985). Accordingly, incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected. See Whelchel v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000) (citations omitted).

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a defense and to present relevant evidence in their own defense.  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984); Chambers v. Mississippi, 410 U.S. 284, 294 (1973)).  This right is not unlimited, but rather, is subject to reasonable restrictions.  United States v. Scheffer, 523 U.S. 303, 308 (1998).  However, the United States Supreme Court has held that the introduction of even relevant evidence can be limited by a State for a valid reason.  Montana v. Egelhoff, 518 U.S. 37, 51-53 (1996).

A state evidentiary rule excluding evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused."  Scheffer, 523 U.S. at 308; Crane, 476 U.S. at 689–91 (discussing the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense").  The Supreme Court has found a violation of the right to present a complete defense in cases where a state evidentiary rule, on its face, "significantly undermined fundamental elements of the defendant's defense," but did little or nothing to promote a legitimate state interest.  Scheffer, 523 U.S. at 315; see also Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727 (2006).

### 3.  Analysis

To the extent that Petitioner may be claiming that the trial court's exclusion of testimony by other inmates violated state evidentiary law, his claim is not cognizable on federal habeas review.  See 28 U.S.C. § 2254(a); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir.1991) (federal habeas courts "do not review questions of state evidence law"); Lincoln v. Sunn, 807 F.2d 805, 816 (9th Cir.1987) ("Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected."); see generally Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) (reiterating that "it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); Smith v. Phillips, 455 U.S. 209, 221 (1982) ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution.").

It is clear that a fair trial includes the opportunity to present a complete defense.  See Crane v. Kentucky, 476 U.S. 683, 690 (1986). This includes the right to present witnesses in one's own defense. Chambers v. Mississippi, 410 U.S. 284, 302 (1972).  "Where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice," but "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."  Id. Put simply, having the opportunity to present a complete defense does *not* provide a criminal defendant with license to present any evidence he pleases. Courts will not find that a due process violation has occurred based on the exclusion of evidence proffered by the defense if the excluded evidence was, among other things, only marginally relevant or repetitive, incompetent, privileged, or otherwise inadmissible. See Crane, 476 U.S. at 689–90; Montana v. Egelhoff, 518 U.S. 37, 42 (1996); Wood v. State of Alaska, 957 F.2d 1544, 1549 (9th Cir.1992); Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir.1983).

Indeed, "in the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."  Chambers, 410 U.S. at 302.  Even relevant and reliable evidence can be excluded when the state interest is strong. See Washington, 388 U.S. at 23 n. 21. Supreme Court decisions provide limited guidance in resolving this clash between state rules and the defendant's right to introduce evidence. On several occasions, the Court has held that state evidentiary rulings were unconstitutional. Yet, in each case, the court has limited its rulings to the specific facts before it. Green v. Georgia, 442 U.S. 95, 97 (1979) ("these unique circumstances"); Chambers, 410 U.S. at 303 ("under the facts and circumstances of this case"); Webb v. Texas, 409 U.S. 95, 98 (1972) ("in the circumstances of this case").  The Supreme Court has found it unnecessary to formulate any flat test to determine when state rules of procedure or evidence trespass upon constitutionally protected ground.  Perry v. Rushen, 713 F.2d at 1450.

A criminal defendant's general right to present evidence is undeniably strong; yet the state's legitimate interest in reliable and efficient trials is also compelling. See Younger v. Harris, 401 U.S. 37 (1971) (state interest in orderly criminal trial process is sufficient to prevent federal courts from

1  enjoining most state criminal trials); United States v. Nixon, 418 U.S. 683, 709–12 (1974) (interest in

2  fair administration of criminal justice outweighs general executive privilege in confidential

3  documents); Ohio v. Roberts, 448 U.S. 56 (1980) (state interest in reliable trials can prevail over

4  defendant's rights to confront witnesses, where hearsay evidence is needed and reliable).

5       Under the federal system, states have always retained considerable freedom in adopting

6  procedures for their own courts. Spencer v. Texas, 385 U.S. 554 (1967); Britton v. Rogers, 631 F.2d

7  572, 580 (8th Cir.1980), cert. denied, 451 U.S. 939 (1981); Vines v. Muncy, 553 F.2d 342, 347 (4th

8  Cir.1977), cert. denied, 434 U.S. 851 (1977); Manning v. Rose, 507 F.2d 889, 892 (6th Cir.1974).

9  Thus, federal courts "should not lightly construe the Constitution so as to intrude upon the

10 administration of justice by the individual States." Patterson v. New York, 432 U.S. 197, 201 (1977).

11      Such admonitions are especially relevant in this case because the basis for the 5th DCA's

12 rejection of Petitioner's exclusion of evidence claim was that the evidence proffered was not relevant

13 and, therefore, inadmissible.  The state court pointed out that none of the prospective witnesses had

14 actually witnessed the incident, that they were being offered to testify about a pattern of abuse by

15 officers against Petitioner, a defense to which Petitioner testified at length during trial, and that the

16 proffered witnesses could not offer testimony relevant to a defense of necessity, which the court ruled

17 was "ill-founded," or to a defense of self-defense, which the court also concluded was unsupported by

18 the evidence, since Petitioner himself argued that he used force solely to get the officers to "leave

19 [him] alone," not to protect himself from imminent harm.

20      Moreover, as the 5th DCA noted, Petitioner cannot credibly contend that the exclusion of such

21 witnesses prevented him from presenting a defense at trial since Petitioner himself was permitted to

22 testify fully about the circumstances he considered relevant to why he assaulted the officers.  Given

23 that the state courts rejected the defenses for which the witnesses would have been called, that

24 Petitioner was allowed to present his own defense theory, and that these non-percipient prospective

25 witnesses themselves had nothing to add to the evidence about the incident proper, deference should

26 be given to the State's rules of evidence and to the decisions regarding their application by the judges

27 tasked with their implementation.  Under such circumstances, the state court adjudication regarding

28 the exclusion of the proffered defense witnesses did not violate the Constitution.  Hence, the claim

11

should be rejected.

     B.    <u>Failure to Re-Initiate Competency Hearing</u>

Petitioner next contends that, after the original competency hearing had resulted in a finding

that Petitioner was competent, the trial court should have initiated a second competency hearing based.

     1.    <u>The 5th DCA's Opinion</u>

The state court denied Petitioner's claim as follows:

Appellant contends that the trial court violated his due process rights when it failed to initiate a competency hearing under section 1368. He claims such a hearing was necessary because counsel expressed doubts about appellant's unreasonable fixation with his defense of mistreatment in prison and justification in possessing a weapon, as well as his failure to understand his exposure to a life sentence for admitting he had a weapon. We reject the argument.

**Procedural background**

In February of 2008, at a trial confirmation hearing, proceedings were suspended after defense counsel stated that, although he understood appellant had had a previous competency proceeding, he believed appellant continued to suffer from a debilitating paranoid delusional state and cognitive problems. A subsequent evaluation by Dr. Laura Geiger in April of 2008, stated appellant had a mental health history dating back to 2005 when he was diagnosed with a "Delusional Disorder Not Otherwise Specified," hospitalized, and given medication. He was diagnosed in 2007 with a "Mood Disorder Not Otherwise Specified," was depressed, and had a paranoid personality style with polysubstance abuse. According to appellant's medical records, his mental health placement was terminated and he was no longer receiving mental health services as of the end of January of 2008.

In a report of her interview with appellant, Dr. Geiger described appellant as initially unwilling to cooperate. But as rapport was built, appellant "began to answer questions which were cogent and thoughtful." Dr. Geiger described appellant as tending to blame others and circumstances for his problems. Dr. Geiger found that

     "despite his history of head injury and word finding difficulties, [appellant] is able to think logically, rationally, and should be able to work with his defense counsel if he so chooses. His mental faculties appear to be under his own mental and volitional control. In addition, [appellant] was recently removed from the mental health delivery system on which he had been placed. While he carries a past diagnosis of a psychotic disorder secondary to the head from a gunshot wound [sic ] and has received intensive outpatient psychotherapy services, this [appellant] is no longer exhibiting any psychotic symptoms such as hallucinations or delusional thoughts. [Appellant] does not take any psychotropic medication; he also does not have any medical disorders which would compromise his faculties to function rationally. Overall, this examiner finds that [appellant] is competent to stand trial and he should be able to cooperate with counsel and handle the decisions which he needs to make, weighing choices and consequences if he so chooses."

Dr. Geiger opined that appellant was capable of understanding the nature and purpose of the proceedings against him, was able to comprehend his own status and condition in reference to such proceedings, and was able to conduct his defense and work with counsel "should he choose to do so." Dr. Geiger diagnosed no current psychotic illness and found that appellant

"exhibit [ed] no signs of psychosis which would require psychiatric intervention such as medication."

In April of 2008, after submission of Dr. Geiger's evaluation, the trial court found appellant mentally competent, and jury trial was set for August 5, 2008.

After various additional delays, trial began on December 2, 2008. During a <u>Marsden</u> motion the next day, defense counsel reported that appellant was unreasonably fixated on his mistreatment defense and his right to possess a weapon, that he failed to understand his exposure to a 25–year–to–life term for admitting he had the weapon, and that he was unable to communicate or assist in a rational defense. The court denied the motion.

Following a recess in which defense counsel spoke to appellant, counsel stated he didn't know whether appellant "continue[d] to suffer from the mental issues that I have previously raised when I raised the [section] 1368 as to [appellant's] obsession with certain issues and inability to communicate.... I just need to make a record as to [appellant's] inability to communicate reasonably to present a defense on his behalf." The trial court confirmed with appellant that he wished to admit possessing the weapon, but took no further action and the prosecution case proceeded.

**Applicable law and analysis**

A criminal defendant "cannot be tried or adjudged to punishment while ... mentally incompetent." (§ 1367, subd. (a).) "A defendant is mentally incompetent" if a mental disorder prevents the defendant from understanding "the nature of the criminal proceedings" or assisting counsel "in the conduct of a defense in a rational manner." (<u>Ibid</u>.) Under section 1369, subdivision (f), a defendant is presumed mentally competent unless proved otherwise by a preponderance of the evidence.

State law and federal due process bar the trial or conviction of a mentally incompetent defendant. (<u>People v. Rogers</u> (2006) 39 Cal.4th 826, 846.) Both

> "require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.] The court's duty to conduct a competency hearing may arise at any time prior to judgment. [Citations.] Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. [Citations.] But to be entitled to a competency hearing, 'a defendant must exhibit more than ... a preexisting psychiatric condition that has little bearing on the question ... whether the defendant can assist his defense counsel.' [Citations.]" (<u>Id</u>. at p. 847.)

Section 1368, subdivision (a), which sets forth the procedure for implementing section 1367 protections, provides that, "[i]f, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent." If, in response, defense counsel informs the court of a belief that the defendant is or may be incompetent, the court shall order the question of the defendant's mental competence determined at a formal hearing held pursuant to sections 1368.1 and 1369. (§ 1368, subd. (b).) The court may order a competency hearing even if counsel believes the defendant is competent. (<u>Ibid</u>.)

"'A trial court is required to conduct a competence hearing, sua sponte if necessary, whenever there is substantial evidence of mental incompetence. [Citations.] Substantial evidence for these purposes is evidence that raises a reasonable doubt on the issue. [Citation.]'" (<u>People v.</u>

Rodrigues (1994) 8 Cal.4th 1060, 1110, quoting People v. Howard (1992) 1 Cal.4th 1132, 1163.)  "[T]his doubt which triggers the obligation of the trial judge to order a hearing on present sanity is not a subjective one but rather a doubt to be determined objectively from the record."  (People v.. Sundberg (1981) 124 Cal.App.3d 944, 955–956; see also People v. Tomas (1977) 74 Cal.App.3d 75, 90.)

When a trial court has ordered a hearing to determine a defendant's competence, it must suspend all proceedings in the criminal prosecution until that determination has been made.  (§ 1368, subd. (c).)  Failure to do so renders any subsequent judgment a nullity, as an act in excess of jurisdiction.  (People v. Superior Court (Marks) (1991) 1 Cal.4th 56, 70–71.)

Once a defendant has been found competent to stand trial, "a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence."  (People v. Medina (1995) 11 Cal.4th 694, 734; see, e.g., People v. Kelly (1992) 1 Cal.4th 495, 542–543 [no change in circumstance to justify second hearing]; People v. Jones (1991) 53 Cal.3d 1115, 1153–1154 [general assertion of defendant's worsening condition and inability to cooperate with counsel inadequate to justify second hearing].)

> "When defense counsel has presented substantial evidence that a defendant is incompetent to stand trial, the trial court must declare a doubt as to the defendant's competence and suspend proceedings even if the court's own observations lead it to believe the defendant is competent. [Citation.]  But when ... a competency hearing has already been held, the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state.  This is particularly true when ... the defendant has actively participated in the trial."  (People v.. Jones, supra, at p. 1153.)

On appeal, a "trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial."  (People v. Rogers, supra, 39 Cal.4th at p. 847.)  But the failure to declare a doubt and conduct a hearing when there is substantial evidence of incompetence also requires reversal of the judgment of conviction.  (Ibid.)

Here, we find no changed circumstances or new evidence to cast doubt on the validity of the prior competence finding.  In her evaluation, Dr. Geiger found appellant had the ability to conduct his defense and to work with counsel "should he choose to do so."  Dr. Geiger found appellant was able to think logically and rationally and he understood the nature of the proceedings against him.  Counsel's complaint was that appellant was uncooperative with him, specifically that he wished to testify in his own defense against counsel's wishes.  But other than his insistence on testifying, appellant did not engage in any outbursts or demonstrations of irrational conduct during the trial, and defense counsel expressed no further concern about appellant's mental state.

Based on the record as a whole, we find no abuse of discretion on the part of the trial court in failing to hold a second (or a third) section 1368 hearing, and we reject appellant's claim to the contrary.

(Ex. A, pp. 5-7).

### 2.   Federal Standard

The conviction of a legally incompetent defendant violates due process. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996). Federal courts have recognized two distinct aspects to competency claims:

14

(1) a procedural due process claim that may arise where a state court has failed to hold a competency hearing where there was a "bona fide doubt" about the petitioner's competence; and (2) a substantive due process claim, where a petitioner was tried and convicted or sentenced while he was in fact, or "actually," incompetent. See, e.g., Davis v. Woodford, 384 F.3d 628, 644 (9th Cir.2004); Williams v. Woodford, 384 F.3d 567, 603–04, 608 (9th Cir.2004).

For a procedural due process claim regarding the denial of a competency hearing, the Ninth Circuit has opined that, under the AEDPA, it is clearly established Supreme Court precedent that a trial court must sua sponte conduct a competency hearing whenever evidence before the trial court raises a "bona fide doubt" about the defendant's mental competency. See Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir.2011) (citing Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir.2010)). A "bona fide doubt" exists where "a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced a doubt with respect to competency to stand trial." Maxwell, 606 F.3d at 568 (citation omitted). "A defendant must show that there was 'substantial evidence' that he was mentally incompetent to stand trial." Davis v. Woodford, 384 F.3d at 644 (quoting Moore v. United States, 464 F.2d 663, 666 (9th Cir.1972)). Furthermore, the responsibility to assess a defendant's competency continues throughout trial, and the same "bona fide" standard applies to determine whether additional competency hearings may be required. Maxwell, 606 F.3d at 568 (citations omitted).[2]

The federal habeas court reviewing such a procedural due process claim may only consider the evidence that was before the trial judge. Williams v. Woodford, 384 F.3d at 604; United States v. Lewis, 991 F.2d 524, 527 (9th Cir.1993). The "inquiry is not whether the trial court could have found the defendant either competent or incompetent, nor whether the reviewing court would find the defendant incompetent." United States v. Mitchell, 502 F.3d 931, 986 (9th Cir.2007).  Rather, in reviewing whether a "bona fide doubt" existed, and whether the state trial court's failure to sua sponte

---

[2] Various cases have used the terms "sufficient doubt," "good faith doubt," "genuine doubt," "reasonable doubt" and "substantial doubt" as to a defendant's competence to stand trial, but the Ninth Circuit has indicated that all of these terms "describe the same constitutional standard." Chavez v. United States, 656 F.2d 512, 516 n. 1 (9th Cir. 1981). The Ninth Circuit has also used the phrase "bona fide doubt" in applying Pate and Drope. See, e.g., U.S. v. White, 670 F.3d 1077, 1082 (9th Cir.2012); Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir.2010); Moran v. Godinez, 57 F.3d 690, 695 (9th Cir.1994).

1   institute competency proceedings therefore violated a petitioner's right to procedural due process, the

2   reviewing habeas court considers "whether a reasonable judge, situated as was the trial court judge

3   whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt

4   with respect to competency to stand trial." Stanley v. Cullen, 633 F.3d at 860 (citation omitted).

5       A defendant is considered competent for constitutional purposes where he has a rational and

6   factual understanding of the nature and object of the proceedings against him, has the ability to consult

7   with his lawyer, and has the ability to assist in preparing his defense. Drope v. Missouri, 420 U.S.

8   162, 171 (1975). Although no particular facts necessarily signal a defendant's incompetence,

9   "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on

10  competence to stand trial are all relevant in determining whether further inquiry is required," and "one

11  of these factors standing alone may, in some circumstances, be sufficient." Drope, 420 U.S. at 180.  In

12  addition, a state trial or appellate court's finding that no competency hearing was required is a factual

13  determination entitled to deference unless it is unreasonable within the meaning of § 2254(d)(2).

14  Mendez v. Knowles, 556 F.3d 757, 771 (9th Cir.2009); Davis v. Woodford, 384 F.3d at 644.

15      On the other hand, to prevail on a substantive due process claim that a defendant was

16  "actually" incompetent during trial, the defendant must show that "at the time of trial he lacked either

17  sufficient ability to consult with his lawyer with a reasonable degree of rational understanding, or a

18  rational and factual understanding of the proceedings against him." See Williams v. Woodford, 384

19  F.3d at 608 (citing Dusky v. United States, 362 U.S. 402, 402 (1960)). Furthermore, in considering a

20  substantive due process claim that the defendant was not actually competent, a reviewing court may

21  consider facts and evidence that were not before the state trial court. See id.  Thus, a review of a

22  substantive due process claim essentially requires the Court to consider what quantum of proof is

23  permissible "'[o]nce a State provides a defendant access to procedures for making a competency

24  evaluation[.]'" Cooper, 517 U.S. at 355, 364 (quoting Medina, 505 U.S. at 449).

25      The state court's factual findings, however, are subject to deference in federal habeas

26  proceedings. See Davis v. Woodford, 384 F.3d 628, 644 (9th Cir.2003) (stating it would defer to the

27  state courts' decisions not to order a competency hearing "unless they are 'unreasonable' within the

28  meaning of 28 U.S.C. § 2254(d)(2)"); Waller v. Wofford,  2012 WL 5870762 at *3 (C.D.Cal. Nov.19,

2012).  When a habeas petitioner alleges a state court made a unreasonable determination of fact under § 2254(d)(2), the federal habeas court "must be particularly deferential to [its] state-court colleagues" on their determinations of fact.  Taylor v. Maddox, 366 F.3d 992, 999–1000 (9th Cir. 2004). The federal district court "may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." Id. at 999.

### 3.   Analysis

As an initial matter, Respondent correctly notes that, to the extent Petitioner is contending that the trial court misapplied state law, i.e., § 1368, such a claim is not cognizable in federal habeas proceedings; rather, this Court is bound by a state court's interpretation of its own laws.

It bears emphasis that Petitioner does not appear to challenge the trial court's original finding of competency.  Instead, Petitioner challenges the trial court's failure to conduct a subsequent competency hearing.  In this regard, as Respondent correctly points out, after an initial finding of competency, further competency hearings are required only in the discretion of the trial judge.  United States v. White, 670 F.3d 1077, 1082 (9th Cir. 2012).  Under California law, a subsequent competency hearing is required only when there is a "substantial change of circumstances" or when new evidence is presented "casting serious doubt on the validity of the prior finding."  People v. Medina, 11 Cal. 4th 694, 734 (1993).

The 5th DCA concluded that no changed circumstances or new evidence were shown to justify a second competency hearing.  The expert, Dr. Geiger, "found [Petitioner] had the ability to conduct his defense and to work with counsel," that he was able to "think logically and rationally," and that he understood "the nature of the proceedings against him."  The primary complaint from defense counsel was Petitioner's insistence on testifying in his own defense against counsel's advice.  However, the appellate court found that, other than this singular complaint, defense counsel had no other concerns about Petitioner's competency and, in the court's view, nothing else that the judge observed suggested that Petitioner was not competent.

Under such circumstances, the state court was not required to conduct a second competency hearing.  Accordingly, the state court's factual findings their due deference in federal habeas

proceedings, see Davis v. Woodford, 384 F.3d at 644, and mindful that this Court should be "particularly deferential to [its] state-court colleagues" on their determinations of fact, Taylor v. Maddox, 366 F.3d at 999–1000, it simply cannot be concluded that the state court's findings were "unreasonable" within the meaning of 28 U.S.C. § 2254(d)(2).  Since the state court's findings do not show any basis for conducting a second competency hearing, Petitioner's claim should be denied.

C.    Denial of Marsden Motion

Petitioner contends that the state court erred in denying his five Marsden motions and the denial on remand of Petitioner's Marsden motion originally heard on January 5, 2009.

1.    The 5th DCA's Opinion

Petitioner contended that the trial court erred in denying his five Marsden motions during various pre-trial hearings.  On appeal, the 5th DCA agreed that the trial court erred regarding denial of the January 5, 2009 Marsden motion, and remanded the case for the superior court to conduct a new Marsden hearing as to that motion only because, in the 5th DCA's analysis, the trial court did not address counsel's failure to present Petitioner's purported significant mental health issues.  As to the other four motions, the 5th DCA's original opinion merely concludes, after carefully reviewing the evidence, that the trial court conducted an adequate inquiry into those motions.  On remand, the superior court denied the remaining Marsden motion and Petitioner appealed to the 5th DCA, which affirmed the superior court's ruling.  In so doing, the 5th DCA reasoned as follows:

> Prior to trial, in February of 2008, the trial court suspended criminal proceedings and ordered appellant evaluated pursuant to section 1368.  In April of 2008, the trial court found appellant mentally competent and reinstated criminal proceedings.
>
> On July 21, 2008, the trial court denied appellant's first Marsden motion, and on November 12, 2008, denied his second Marsden motion.
>
> On December 2, 2008, the jury was sworn.  The following day, the trial court denied appellant's third Marsden motion.  On December 5, 2008, the jury found appellant guilty as charged and found that the attempted murder was willful, deliberate, and premeditated (§ 664, subds. (e), (f).)  In a bifurcated proceeding, the jury found strike and serious felony allegations true.
>
> On January 5, 2009, the trial court denied appellant's fourth Marsden motion. That same day, the trial court appointed new counsel to investigate whether there were grounds to file a motion for new trial.  On March 4, 2009, substitute counsel informed the trial court that she had reviewed the transcripts of trial, appellant's previous new trial motion, and a declaration provided by appellant and found no legal cause for a new trial.  The trial court denied the motion for new trial.  On March 20, 2009, the trial court denied appellant's fifth Marsden

motion.  That same day, the trial court denied probation and sentenced appellant to state prison for an indeterminate term of 104 years-to-life.

Appellant filed an appeal alleging that the trial court erred when it excluded all of his defense witnesses; declined to initiate subsequent competency proceedings; denied his <u>Marsden</u> motions; and failed to give necessity defense4 and attempted voluntary manslaughter instructions. Appellant also argued defense counsel was ineffective for having him testify in narrative form.  He finally argued cumulative error and various sentencing errors.

On March 17, 2011, this court found error occurred during the January 5, 2009, <u>Marsden</u> hearings and found several sentencing errors.  We conditionally reversed and remanded the matter and ordered the trial court to conduct a <u>Marsden</u> hearing focused solely on appellant's complaints that he had mental health issues at the time of the incident.  If the trial court found that appellant had shown that a failure to replace counsel would substantially impair his right to assistance of counsel, the trial court "shall appoint new counsel to represent him and shall entertain such applications as newly appointed counsel may make."  We found further that, if newly appointed counsel makes no motion, or any motions made are denied, or if appellant's Marsden motion is denied, the court shall reinstate the judgment.  In the event that the trial court reinstated the judgment, this court ordered the trial court to prepare an amended abstract of judgment indicating a total aggregate term of confinement of 91 years to life.

In accordance with this court's order, the trial court conducted a <u>Marsden</u> hearing on April 25, 2012.  On May 18, 2012, the trial court denied appellant's <u>Marsden</u> motion and reinstated the corrected judgment. At issue in this appeal is the trial court's denial of appellant's April 25, 2012, <u>Marsden</u> motion. We find no error and affirm.

**DISCUSSION**

Before we discuss the April 25, 2012, <u>Marsden</u> hearing at issue, we repeat what occurred at the January 5, 2009, <u>Marsden</u> hearing, appellant's fourth such motion, and our finding on that hearing.

**January 5, 2009, <u>Marsden</u> hearing**

On January 5, 2009, following conviction, defense counsel advised the trial court that appellant wanted a new attorney to investigate a motion for new trial. Appellant confirmed this request. The trial court determined that appellant was requesting a <u>Marsden</u> hearing.

During the subsequent closed-door hearing, appellant complained that defense counsel had not called four witnesses "prudent" to his case; he claimed he was suffering from "mental health issues" and "extreme duress" at the time of the incident, which was not brought out at trial; and that he and defense counsel had communication issues and never agreed on the "direction" of appellant's defense.  Specifically, appellant complained at the hearing that he felt "there was no defense help in my case with the exception of him arguing that, that of the weapon.  During the time of the incident, I had mental health issues. I was, believe if I'm not mistaken, I was Triple CMS and doing counseling and on psychiatric-."  When the trial court responded, "So," appellant replied, "And none of this came up in my trial during that time and/or before and after [that] I was under extreme duress."

The trial court summarized appellant's concerns as threefold: (1) that defense counsel did not "come up with" a defense that was satisfactory to appellant; (2) that defense counsel failed to argue psychiatric or psychological issues in the matter; and (3) that appellant had "communication issues" with defense counsel.  The court stated, "As far as [issues (1) and (2)], the Court actually issued a ruling concerning whether or not some of those issues could be brought into play as whether they were relevant, deeming that they were not relevant in the matters. [¶] ... [¶] So the court only sees the communication aspect."

When defense counsel was asked to respond to appellant's allegations, he submitted on the issues, explaining he had "been through" these issues on more than one occasion with appellant.  Defense counsel also thought the issues raised by appellant were "unreviewable" by him because they involved a review of his own performance during trial, creating a conflict.

The trial court then denied appellant's <u>Marsden</u> motion, explaining that appellant had failed to reach the burden required for the court to appoint new counsel for all purposes, but explained that it would address appellant's request for a new trial in open court.

Back on the record, the trial court stated that defense counsel would not be expected to investigate his own competency during trial with regard to appellant's request for new trial and asked appellant if he wished to pursue the motion on his own.  Appellant responded that he wanted another attorney to review the motion.  After explaining that a new attorney would take the lead on investigating the merits of such a motion, the court appointed another attorney to do so.

In a hearing two months later, the substitute attorney informed the trial court that she had reviewed the transcripts of trial, the new trial motion, and a declaration provided by appellant and found no legal cause for a new trial.  However, neither the new trial motion nor Mayhan's declaration were part of the record.

**Our review of the January 5, 2009, <u>Marsden</u> hearing**

During the January 5, 2009, <u>Marsden</u> hearing, defense counsel, responding to appellant's assertion that defense counsel had failed to pursue "mental health issues" appellant had been suffering from at the time of the offenses, said that they had "been through this on more than one occasion."  The trial court also indicated it had considered appellant's mental health issues before.  On appeal, appellant claimed that, in both the pretrial <u>Marsden</u> hearings and the competency proceedings, the focus of the trial court was on current trial competency and not on defenses based on mental health issues at the time of the offenses.  As argued by appellant, his post-trial complaint about failure to pursue any mental health defense raised new questions about defense counsel's performance.  Appellant did note that his mental health background was briefly discussed during the November 12, 2008, <u>Marsden</u> hearing, when he complained that counsel did not respond to his request to have his "C File" and "114A file" (which appellant described as his "mental health folder") copied and admitted into evidence.  Further discussion with appellant revealed that he did not want to admit the files into evidence but rather have defense counsel review those files in order to explain what led up to the incident that occurred.  Defense counsel stated that he had "several volumes of this case" and had spent "probably a hundred plus hours in reviewing it," although he did not specify whether the mental health file appellant mentioned was included in that review.

Respondent asserted contrarily that appellant's complaint at the January 5, 2009, <u>Marsden</u> hearing that he had mental health issues at the time of the incident had to be viewed in the context of all of the proceedings and appellant's constant insistence that defense counsel failed to present a defense that his actions were the result of "extreme duress."  As argued by respondent, appellant's attempt to assert the defense of duress, which the trial court found unavailable and which was discussed on numerous occasions throughout the course of the trial, included consideration of the "mental health issues" of which appellant spoke on January 5, 2009.  Thus, respondent argued, those issues had been considered before.

We found nothing in the record to show that the trial court ever, either at the January 5th hearing or at any time before, considered or requested defense counsel specifically respond to appellant's assertion that defense counsel failed to pursue mental health issues as a defense.  Although the trial court, in response to appellant's complaint at the January 5th hearing, stated that it had already ruled on that issue, it was not clear from the record whether the trial court was referring to appellant's assertions, to its earlier ruling, or if it mistakenly conflated

appellant's mental health issues with the duress defense it had previously ruled on. In any event, we found defense counsel was never asked to respond to this particular concern.

Marsden requires that the trial court make a record sufficient to show the nature of the defendant's grievances and the court's responses to them.  (People v. Mendez (2008) 161 Cal.App.4th 1362, 1368.)  This, we found, the trial court failed to do.

**April 25, 2012, Marsden hearing**

At the April 25, 2012, Marsden hearing, the trial court began by stating that, as instructed by this court, the hearing would focus "only on appellant's complaints that he had mental health issues at the time of the incident" as alleged during the January 5, 2009 Marsden hearing.

Appellant began by testifying that he had raised his mental health issues at the time of the incident many times to defense counsel.  Appellant recounted his status in the mental health treatment facility in prison and stated that he informed defense counsel that he wanted him to bring appellant's "C-file" and mental health file to court to be used as a "defens[e] measure." But appellant was frustrated that defense counsel failed to do so. According to appellant, he was on medication in 2006 when the crimes occurred and he believed that should affect his defense.  Appellant explained his mental health history to the court prior to the crimes and explained that, at the time of the crimes, he was "classified as mental health, and the status was Triple CMS, and ... was seeing clinicians, and the head chief, head psychs, and all that and ... was on psychotropic medication[.]"  Appellant claimed he had been on medication from "April 15, 2005 until 2008 or 2007; 2008, or something like that. 2006."  Appellant explained that when he first was medicated, at Pelican Bay, he felt the effects for "maybe a week."

The trial court then asked defense counsel about whether he had discussed appellant's mental health and considered it as a possible defense.  Defense counsel explained that, prior to the presentation of the defense case, the trial court had denied the defense request to present witnesses on a defense of necessity or duress.  As such, defense counsel explained that the two remaining options for appellant related to his mental health history were sections 1368 (competency) and 1026 (insanity) defenses.  Defense counsel did not believe a section 1368 defense was appropriate because appellant could comprehend the actions taken against him and could communicate with counsel.  In fact, according to defense counsel, appellant was able to articulate his theory of the defense "extremely well, and was very adamant about it," despite the fact that defense counsel could not find supporting evidence for it.  According to defense counsel, although he and appellant disagreed "somewhat" on the issue, defense counsel never believed that appellant "was unable to assist counsel or suffered from a mental defect that would prevent him from understanding the complications and the consequences of his particular situation to the point of arising to a [section] 1368 proceeding at that time."

As for an insanity defense pursuant to section 1026, defense counsel stated that he did discuss the issue with appellant, but that appellant did not wish to enter an insanity defense.  Instead, appellant's position was always that he was forced to attack the officers based on his belief of duress or necessity.  Defense counsel, who stated he had vast experience with patients on psychotropic medications, explained that "[a]t no time did [appellant] present to me to be someone that was so medicated that he was out of it."  Defense counsel noted this was evidenced by the fact that appellant had planned the attack on the officers for some time based on his feeling of how the officers were treating him.

The trial court stated that it did not believe this court was looking at a section 1368 defense, but was focused more on counsel's consideration of a section 1026 defense.  Defense counsel again confirmed that he had considered and discussed an insanity defense with appellant, but elected not to go forward with it.  Defense counsel reiterated:

"I believe it was discussed with him early on. But, again, it was not his position that he didn't understand what was going on; [instead] that his actions were deliberate in response to the provocation and threats and duress that he felt at the time."

In response to the trial court's question whether there had been a discussion as to the medication appellant was taking or his claim that he was a "mental health designee," defense counsel acknowledged that appellant was "designated as Triple CMS at the time," which was always a "red flag," and he had discussed those issues with appellant. In all the times defense counsel spoke to appellant, although at certain times he was taking some medication, defense counsel did not believe that appellant's thoughts or his ability to cooperate with defense counsel or reasonably move forward were ever clouded by medication, "nor did it raise an issue in regards to a 1026 insanity defense at the time of the defense."

The trial court then asked defense counsel that, if there had been some issue that appellant was unable to comprehend at the time of the incident, did defense counsel know "how to go about asking the Court for doctors ..." Defense counsel assured the trial court that he was "well versed" on the issues of whether a section 1026 or 1368 proceeding was appropriate or whether to request an "outside expert pursuant to [Evidence Code section] 730," and that he had had significant contact with doctors at the time. Defense counsel spoke with Dr. Estner "informally" about appellant's case, primarily in regards to appellant's fixation with particular issues, such as the issues of duress and necessity.

The trial court then asked appellant for comment. Appellant maintained that "none of these issues" were ever addressed by defense counsel from the time he was first assigned to the case up until the close of trial. Appellant claimed he only discussed the issues in the context of speaking to a "female psychiatric specialist" who asked him if he could "co-exist" with defense counsel. But, according to appellant, she did not ask how he had felt at the time of the incident or what medication he was on at the time.

When asked by the trial court if he had told "them" how he "felt" appellant said, "Yes. On numerous occasions, or I thought I did. Maybe I was impaired at the time...." When asked how he felt today, appellant stated that, although he had been shot in the head, over the years he had managed "to deal with it," but for the most part he felt competent enough to understand what was going on. When asked whether he was taking the same type of medication currently, appellant stated, "No. I try to deal with it myself."

Appellant explained again that when he was in Pelican Bay, "they shot me up, and this went on for days." When asked by the trial court if this was before the trial, appellant stated that it was "before the incident and you, know, it led up to that." Appellant stated that he was taking psychotropic medications "on and off until 2008." According to appellant, he tried to tell defense counsel that he was on medication and seeing clinicians at the time of the incident. Appellant testified that he also told defense counsel that he should be reviewing his "C-file" and "mental health file," and "these are loopholes that you need to ... check into ... for me to have the best defense possible," but that defense counsel ignored his request. Appellant claimed he did this at each meeting he had with defense counsel.

When asked again by the trial court whether appellant had discussed the various possible defenses with defense counsel, appellant stated he thought he did, "unless I was somewhere else. And if I was somewhere else, then I was mentally impaired then." Appellant again reiterated his belief that, if he was on medication when these incidents occurred, defense counsel should have addressed that. Appellant stated that the jury should have known that, even if he was not on medication at the time of trial, he was at the time of the incident, as well as under psychiatric care. Appellant thought that information could have swayed a decision by the jury.

22

When asked to respond, defense counsel stated that he had discussed with appellant the fact that diminished capacity was not a defense in this situation, but that it might be an issue on certain elements of the attempted first degree murder charge.  But appellant's issue of intent always went back to appellant's belief that he had a defense of duress or necessity. Defense counsel stated that at no time did appellant express a wish to enter a plea of not guilty by reason of insanity.  As for his competence, defense counsel stated that appellant was examined by several doctors, one of whom, Dr. Geiger, examined him closest to the time of the incident and found him competent.

The trial court then asked defense counsel if, after reviewing appellant's documentation and the fact that he may or may not have been under medication at the time of the incident, or may or may not have told him he wished to plead guilty by reason of insanity, had defense counsel still considered an insanity plea.  Defense counsel stated that he did, but that appellant did not wish to do so.  Instead appellant wanted to proceed on finding supporting witnesses for the issue of duress or necessity.

Appellant insisted that defense counsel at no time asked if he was interested in a plea for temporary insanity due to mental health issues.

Appellant then asked that the trial court look at various documents he brought with him to the hearing attached to his written motion.  Defense counsel was allowed to review the documents and stated that he was in possession of all of them.  Included was Dr. Geiger's report, which was done as part of the section 1368 proceeding, in which the doctor opined that, although appellant had a long history of mental illness, he was able to communicate and speak with defense counsel in building a defense.

In a final argument, defense counsel noted that, in regards to a section 1026 defense, appellant repeatedly asserted in all of his many <u>Marsden</u> hearings that he was "not crazy" and could move forward in the case.  According to defense counsel, at no time did appellant want to say or admit that he was psychotic at the time of the incident, and he was not interested in an insanity plea.  Instead, he was steadfast on the issue that he was forced into his actions during the incident.

In its May 18, 2012, ruling on the <u>Marsden</u> hearing, the trial court summed up appellant's concerns as follows:

> "During the relevant <u>Marsden</u> hearing, [appellant] indicated that [defense counsel] had failed to take steps to investigate or otherwise address a potential mental health defense to the charges against him in this case.  Specifically, [appellant] explained to the Court that at the time of the 2006 incident, he was under medication for his mental health issues and believed that such facts should have been raised in the defense to the charges against him."

The trial court noted that the documents attached to appellant's written motion confirmed that he was a participant in the mental health system at Corcoran at a "CCCMS level of care."  The trial court stated that, according to appellant, he told defense counsel that he needed to secure his "C-file" and his mental health file from the prison and that his mental health status at the time of the incident needed to be explored but that defense counsel ignored his request.

The trial court stated that defense counsel, in response to appellant's allegations, stated that the issue of appellant's mental health was considered by him; that he understood appellant to be at the CCCMS level of care at the time of the incident; and that, in conversations with appellant, appellant insisted that he had no other option but to take the action he did during the incident. The court also stated that defense counsel had said he discussed with appellant the inconsistencies between a section 1026 defense and his insistence that his actions were based on necessity and duress, and that the evidence secured from appellant confirmed that he had

planned the actions for some time prior to the incident.  The court stated that defense counsel had also discussed with appellant the fact that diminished capacity was not a defense, but only relevant to the issue of his level of intent.

The trial court then stated:

> "Based upon the foregoing and the entire record before this Court, it's hereby ordered the motion is denied. [¶]  It appears that [defense counsel] appropriately considered and rejected as a matter of trial tactic[s] a mental health defense in favor of an affirmative defense, and based those theories of duress and necessity most consistent with the facts as relat[ed] to [defense counsel] by [appellant]. [¶]  Disagreement over trial tactics does not warrant appointment of new counsel."

**Applicable Law and Analysis**

A Marsden motion is addressed to the discretion of the trial court and a defendant bears a very heavy burden to prevail on such a motion.  (People v. Bills (1995) 38 Cal.App.4th 953, 961.)  "When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance."  (People v. Crandell (1988) 46 Cal.3d 833, 854, abrogated on another ground as stated in People v. Crayton (2002) 28 Cal.4th 346, 364–365.)  "The defendant ... cannot rest upon mere failure to get along with or have confidence in counsel."  (People v. Bills, supra, at p. 961.)

A disagreement as to tactics and strategy is not sufficient to require a substitution of counsel.  (People v. Stewart (1970) 6 Cal.App.3d 457, 464–465.)  There is "no constitutional right to an attorney who will conduct the defense of the case in accordance with an indigent defendant's whims."  (People v. Nailor (1966) 240 Cal.App.2d 489, 494.)  Neither can a defendant compel substitution of counsel through his own intransigence and failure to cooperate.  (People v. Kaiser (1980) 113 Cal.App.3d 754, 761.)  "[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict."  (People v. Smith (1993) 6 Cal.4th 684, 696.)

Appellant contends that the trial court erred in denying his most recent Marsden motion because he demonstrated "colorable claims demanding appointment of counsel to investigate a new trial motion based on failure to investigate and present apparently significant medication/mental health issues going to diminished actuality."  (Full capitalization omitted.)  Based on his allegations of error, appellant requests that this Court remand this matter again with instructions to appoint new counsel to investigate his medication and mental health issues.  In the alternative, appellant seeks to have this court remand the case again for further inquiry in another Marsden hearing.  We find no error on the part of the trial court in denying appellant's Marsden motion.

On remand, this Court ordered the trial court to hold a Marsden hearing "focused only on appellant's complaints that he had mental health issues at the time of the incident."  Despite appellant's claims to the contrary, we find that the trial court properly investigated his complaints about defense counsel's investigation of his mental health status at the time of the incident.

At the Marsden hearing, the trial court gave appellant ample and repeated opportunity to explain his mental health history and treatment and his concerns involving defense counsel.  During the hearing, appellant stated that he had raised his concern regarding his mental health status at the time of the incident to defense counsel.  As such, appellant acknowledges that defense counsel was aware of appellant's mental health status and appellant's belief that it should be used defensively.

24

Defense counsel, in response to appellant's statements and the trial court's questioning, demonstrated that he had considered an insanity defense for appellant, but that appellant had refused to consider such an option.  Defense counsel explained that, after the trial court denied the defense request to present a defense of necessity or duress, he considered the defenses of competency (§ 1368) and insanity (§ 1026).  Defense counsel then explained to the trial court why he did not present either of those defenses at trial.  Specifically, defense counsel stated that, while he did consider and discussed with appellant the possibility of an insanity defense, appellant was adamant about not pursuing such a defense.

Thus, contrary to appellant's claim, this was not a case where defense counsel failed to consider appellant's mental status at the time of the crime.  Instead, because appellant insisted on it, defense counsel instead prepared a duress or necessity defense, which was subsequently not allowed by the trial court.

In addition, contrary to appellant's assertions on appeal, the record demonstrates that defense counsel knew of appellant's mental health history but determined that appellant was not mentally impaired at the time of the crimes.  Defense counsel explained that he had a great deal of experience with medicated and mental health clients and assured the trial court that he knew how to ask the court for help if he needed additional professional assistance in assessing a client. In appellant's case, defense counsel discerned no indication that appellant did not understand the consequences of his actions at the time of the incidents.  Defense counsel noted that appellant's judgment never appeared clouded by medication, as evidenced by the fact that appellant took the time to construct a weapon to attack the officers.  Defense counsel, in fact, believed that appellant's actions in the attack were "deliberate."

The record supports, as the trial court found, that defense counsel made a reasonable tactical decision not to present an insanity defense.  The lengthy discussion during the Marsden hearing demonstrates that both the trial court and defense counsel adequately considered appellant's mental health argument.  Defense counsel repeatedly affirmed that appellant could communicate with him, and that defense counsel believed appellant understood the nature of his actions at the time he committed the crimes, as evidenced by the fact that appellant took the time to fashion a weapon and believed he was justified in attacking the officers in response to continued harassment.

Based on defense counsel's repeated affirmations that he presented appellant with an option to enter an insanity plea, we find, as did the trial court, that defense counsel sufficiently investigated appellant's mental health issues at the time of the offense and properly denied appellant's Marsden motion. The fact that appellant did not agree with defense counsel's trial tactics is of no concern.  (People v. Stewart, supra, 6 Cal.App.3d at pp. 464–465; People v. Nailor, supra, 240 Cal.App.2d at p. 494.)  Furthermore, although appellant disagreed with defense counsel's assertions that the two had discussed an insanity plea, defense counsel repeatedly affirmed that he had.  "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.' " (People v. Smith, supra, 6 Cal.4th at p. 696.)  Given the fact that defense counsel demonstrated an in-depth understanding of appellant's mental health status and its consequences, the trial court likely concluded defense counsel's explanation was more persuasive.

We find that, on the record before us, and contrary to appellant's assertions, the trial court adequately considered defense counsel's investigation into appellant's mental health status at the time appellant committed the offenses.  The trial court therefore properly denied appellant's Marsden motion.

(Doc. 17, Ex. B, pp. 21-27)

///

1          2.      Federal Standard

2          The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to

3   counsel and therefore is properly considered in a habeas proceeding.  Bland v. California Dep't of

4   Corrections, 20 F.3d 1469, 1475 (9th Cir.2000).  It is well settled that when a criminal defendant

5   voices a seemingly substantial complaint about counsel, the trial judge should make a thorough

6   inquiry into the reasons for the defendant's dissatisfaction.  See id. at 1475–76; United States v.

7   Robinson, 913 F.2d 712, 716 (9th Cir.1990).  While a defendant has the right to make a motion for

8   new counsel based on the defendant's perception of ineffective assistance of counsel, he does not have

9   an automatic right to the substitution of counsel simply because he is dissatisfied with appointed

10  counsel's performance.  Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir.1990).  The Sixth Amendment

11  guarantees effective assistance of counsel; it does not guarantee a "meaningful relationship" between

12  an accused and his attorney.  See Morris v. Slappy, 461 U.S. 1, 14 (1983).

13         The ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth

14  Amendment right to counsel was violated.  Schell v. Witek, 218 F.3d 1017, 1024–25 (9th Cir.2000)

15  (en banc). The habeas court considers whether the trial court's denial of or failure to rule on the motion

16  "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his

17  attorney had become so great that it resulted in a total lack of communication or other significant

18  impediment that resulted in turn in an attorney-client relationship that fell short of that required by the

19  Sixth Amendment."  Id. at 1026.

20         3.      Analysis

21         First, and most obviously, to the extent that Petitioner is contending that the state court's

22  rejection of his Marsden claims was a violation of state law, these rulings are not properly a subject of

23  habeas relief since this Court's habeas jurisdiction extends only to federal constitutional claims.

24         To the extent that Petitioner is contending that the denial of one or more of his Marsden claims

25  implicated his right to counsel or to a fair trial, such claims must also be rejected.  As to the four

26  Marsden motions rejected in the 5th DCA's first opinion, the record does not contain any basis for

27  requiring the removal of defense counsel under Marsden.  Indeed, in the 5th DCA's first opinion, the

28  appellate court sets forth in detail the colloquies between the trial judge and defense counsel,

26

1    Petitioner's complaints about counsel's performance, and counsel's response to Petitioner's

2    complaints.  In each case it clearly appears that, contrary to Petitioner's assertions, a reasonable jurist

3    exercising the discretion vested in the court could have concluded that Petitioner did not set forth

4    sufficient grounds to require the granting of a <u>Marsden</u> motion.

5           Rather, Petitioner contends that irreconcilable differences existed between counsel and

6    Petitioner and that the trial court failed to conduct a sufficient inquiry into those purported conflicts.

7    (Doc. 1, p. 26)  In the instant petition, with the exception of his mental health claims directed at the

8    remanded January 5, 2009 motion, Petitioner does not provide any further details regarding the nature

9    of the conflicts he claims or why the trial court's inquiry into those conflicts was insufficient.

10   Petitioner instead argues that he and counsel were "both attempting to prepare for trial in good faith

11   but both affirming a complete inability to communicate…." (<u>Id</u>.).  However, the mere fact that

12   Petitioner and counsel disagree about how to prepare for trial does inevitably entail a conclusion that

13   counsel and Petitioner could not communicate.  If Petitioner's logic is followed to its conclusion, then

14   every disagreement between an accused and his attorney justifies replacement under <u>Marsden</u>.

15   Clearly, this is not the law of California and certainly not a due process requirement for effective

16   representation or a fair trial.

17          Petitioner also mentions that counsel failed to assist in locating inmate witnesses from nearby

18   cells to testify and that counsel should have filed a <u>Pitchess</u> motion to obtain information about

19   misconduct charges against various correctional officers.  (<u>Id</u>., p. 27) [3]  The 5th DCA's first opinion,

20   however, explains in detail how several of Petitioner's attorneys located and interviewed potential

21   inmate witnesses but rejected them as problematic.  Counsel indicated that he had rejected the

22   suggestion of filing a <u>Pitchess</u> motion because of its limited relevance and the possibility that pursuing

23   that line of inquiry, i.e., that correctional officers routinely engaged in mistreatment of prisoners,

24   would lead to Petitioner admitting that he had armed himself, which could subject him to a life

25   sentence.  While Petitioner may have disagreed with the various tactical decisions by his defense

26

27   _____

[3] Although at the time of the various <u>Marsden</u> hearings before and during trial, Petitioner raised other issues, e.g., lack of
28   communication, failure to prepare an adequate defense, etc., Petitioner does not mention or raise these issues in his
petition.  The Court is under no obligation to address issues not presented in the petition; accordingly, those grounds raised
in state court but not in these proceedings will be ignored.

counsel, including the decision not to call inmates as witnesses and the refusal to file a <u>Pitchess</u> motion, such disagreements did not warrant substitution of counsel.  <u>See Brookhart v. Janis</u>, 384 U.S. 1, 8 (1966) ("[A] lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval.")  To the extent that Petitioner is contending that counsel failed to communicate regularly or in person, Petitioner fails to explain how, even if true, that lack of communication affected the quality of counsel's representation or the ultimate result.  Ineffectiveness is not established without a showing of how the deficient consultation caused harm.  <u>United States v. Rogers</u>, 769 F.2d 1418, 1425 (9th Cir.1985). Petitioner's desire for more frequent visits or communication with counsel is simply not a legal basis for substituting counsel.

Finally, even assuming that Petitioner's technical point is well taken, i.e., Petitioner has not and cannot establish from this record that the error was in any way prejudicial.  What is clear from the first opinion by the 5th DCA is that counsel was very concerned about the direction Petitioner wished to take his defense, especially his insistence on arguing that he had to arm himself to protect against a pattern of abuse by guards.  Given an attorney's ethical obligation to vigorously represent his client, counsel's concern that admitting to possessing a weapon would subject Petitioner to a potential life sentence was entirely justified.  Under such circumstances, following all of Petitioner's advice and presenting a defense of justification and heat of passion, as discussed *infra*, would have been both futile for an acquittal and potentially devastating for guilt and a lengthy prison sentence.  Under such circumstances, the Court will not presume prejudice.  Nothing in the record shows that the trial court's failure to grant the four <u>Marsden</u> motions rejected by the 5th DCA had "a substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson,</u> 507 U.S. 619, 623. Accordingly, the Court finds that any error was harmless as to these motions.

As to the fifth motion that was the subject of remand, the issue was the trial court's original failure to conduct an inquiry into potential mental health issues and counsel's own inquiry, or lack thereof, into those issues.  On remand, the 5th DCA relied upon the representations of counsel that he had considered an insanity defense and an incompetency defense but rejected them because of Petitioner's objections, that counsel had attempted to mount a defense of necessity and duress but that was disallowed by the trial court, that counsel was quite familiar with Petitioner's mental health

history, and that counsel himself had significant experience in dealing with such issues.  The appellate court concluded that "[t]he record supports, as the trial court found, that defense counsel made a reasonable tactical decision not to present an insanity defense," that both trial counsel and the judge "adequately considered appellant's mental health argument," and that, in defense counsel's experienced opinion, Petitioner understood the nature of his actions at the time he committed the crimes and that Petitioner could adequately communicate with counsel before and during trial.  The court further reasoned that Petitioner's disagreement with counsel's tactical decisions did not constitute grounds to grant a Marsden motion.

The state court's analysis was thorough and based on substantial evidence in the record.  As mentioned, tactical decisions of counsel do not justify the court granting a Marsden motion.  See Brookhart v. Janis, 384 U.S. at 8.  Accordingly, the state court's adjudication on remand of the fifth Marsden motion, original heard on January 5, 2009, was not objectively unreasonable.

D.    Ineffective Assistance of Counsel

Petitioner next contends that his attorney was ineffective for allowing Petitioner to testify at trial in narrative form, thus conveying to the jury that counsel believed Petitioner would present perjured testimony.  This contention lacks merit.

1. The 5th DCA's Opinion

The appellate court denied Petitioner's claim with the following analysis:

Appellant argues that defense counsel was ineffective when he requested that appellant testify in narrative form based on the unfounded assumption that his testimony would be perjured. Specifically, appellant contends this decision denied him his right to present a defense and it violated his right to due process and a fair trial. We find no prejudicial error.

**Procedural background**

During the December 3, 2008, Marsden hearing, defense counsel explained his concerns about appellant's desire to testify at trial. According to counsel, appellant was adamant that he was mistreated by the correctional officers for two to three years prior to the incident and wished to convey this to the jury.  Although defense counsel advised appellant that mistreatment was not sufficient to obviate the fact that appellant was a prisoner in possession of a weapon in his cell, appellant was convinced he wanted to testify to the mistreatment as the reason for possessing the weapon.

Later during the same hearing, defense counsel again advised the trial court that he believed appellant was going to admit possessing the weapon but felt he was justified because he was mistreated by the officers.  Although defense counsel did not believe mistreatment was a legal justification for appellant's actions, he was unable to communicate that to appellant.

The trial court then asked appellant if he intended to testify, and appellant confirmed that intent.  The court explained that if appellant testified to "certain admissions such as you actually possessed a weapon while in prison," that would cause him to be found guilty of at least one of the charges against him.  Appellant explained that if he did not testify, he would be found guilty of the charges anyway because the officers stated that they found the weapon in his cell.  The court again explained that appellant had the right to testify, that his attorney advised him against it, but that the court would allow appellant to exercise his right.  Appellant did not respond, which the court noted on the record.

At trial, before appellant took the stand, an in camera hearing was conducted regarding appellant's decision to testify.  Defense counsel then requested that appellant testify in narrative form pursuant to Nix v. Whiteside (1986) 475 U.S. 157, because appellant wished to testify against the advice of counsel.  Defense counsel explained that he had advised appellant of his right to testify, the fact that it was the People's responsibility to prove its case, and of the "dangers and significant pitfalls" in taking the stand, but appellant still insisted he wished to testify. Appellant agreed that that was the case.

The trial court noted that Nix v. Whiteside deals with both a defendant's intent to testify against the advice of counsel and also with perjurious testimony.  The court stated it was not asking defense counsel to state explicitly whether he considered appellant's testimony perjurious but assumed this was implicit in the request.  Defense counsel explained that he requested narrative testimony because that allowed appellant to "get into areas that I cannot substantiate or corroborate and would be improper for me to lead him through questioning when I know or don't know that those things would be perjurious or not."

The court granted defense counsel's request.  Appellant then again stated that he wanted the jury to know "what lead up to this," particularly that he had not been fed, he had been abused, and the officers had tampered with his meals.  Defense counsel again stated that appellant's intent to admit possessing the weapon was injurious and against his advice.  The court warned appellant that it did not think he had a duress defense, but appellant explained that the jurors would expect an explanation of why the incident occurred.

As appellant began his testimony, the court asked appellant what he wished to tell the court and the jury.  Appellant then testified that he did possess a weapon, and that, by his actions, he intended to make the officers leave him alone.  On cross-examination, appellant testified that he was trying "to get" Officer Braswell.  On redirect examination, appellant denied intending to murder Officer Hieng.  And in recross-examination, when asked whether he attempted to murder Braswell, appellant stated, "No, but I ... can't tell you at the time how I was feeling."

**Applicable law and analysis**

It is well settled that a criminal defendant has an absolute right to testify over the objection of trial counsel.  (See, e.g., People v. Frierson (1985) 39 Cal.3d 803, 813; People v. Robles (1970) 2 Cal.3d 205, 214–215; People v. Harris (1987) 191 Cal.App.3d 819, 824, 825.)  It is equally settled that a defense counsel's refusal to participate in the presentation of perjurious testimony from the accused does not deny the client effective assistance of counsel.  (Nix v. Whiteside, supra, 475 U.S. at p. 171.)

Under such circumstances, the courts have recognized a criminal defendant may testify on direct examination using a "narrative" form, rather than a question and answer form, allowing the defendant to tell the jury, in his or her own words, the defendant's version of what occurred.  Courts have adopted this approach to balance the defendant's fundamental right to testify with counsel's ethical obligations.  The option of presenting testimony in a narrative form arises directly from these conflicting interests.  (People v. Johnson (1998) 62 Cal.App.4th 608, 629–631.)

The California cases <u>People v. Guzman</u> (1988) 45 Cal.3d 915 (<u>Guzman</u>), overruled on another point in <u>Price v. Superior Court</u> (2001) 25 Cal.4th 1046, 1069, footnote 13, and <u>People v. Gadson</u> (1993) 19 Cal.App.4th 1700 (<u>Gadson</u>), in the context of ineffective assistance of counsel claims, have expressly approved the use of the narrative approach.

In <u>Guzman</u>, a capital case, defense counsel informed the court that the defendant would be testifying against his advice and in a free narrative form.  The court advised the defendant to follow his attorney's advice and warned him of the drawbacks of testifying. The defendant elected to testify and did so in a narrative form.  (<u>Guzman, supra</u>, 45 Cal.3d at pp. 941–942.) Lead counsel did not argue the defendant's testimony to the jury, although the defendant's second counsel referred to some of the testimony in argument.  (<u>Id</u>. at p. 942.)

On appeal, the defendant argued use of the narrative approach resulted in a denial of his right to effective assistance of counsel because counsel did not use his version of the facts in argument, his attorney-client privilege was violated, and his attorney's approach was the product of a conflict of interest which was resolved against him.  (<u>Guzman, supra</u>, 45 Cal.3d at p. 942.)  The <u>Guzman</u> court rejected these arguments, noting first that that neither the United States Supreme Court nor the California Rules of Professional Conduct prohibited use of the narrative approach.  (<u>Guzman</u>, at pp. 942, 944.)  It rejected the defendant's claim that, because he testified in narrative fashion, the jury had notice that his counsel did not believe him. The defendant's testimony was clear and coherent and his attorneys' conduct in no way signaled to the jury that they disbelieved their client.  (<u>Id</u>. at p. 946.)  The court also rejected the defendant's argument that the narrative testimony in essence forced him to unknowingly represent himself.  It found that the defendant had been "forced" to represent himself only with respect to his own direct testimony; otherwise, counsel had been available and participated in the trial. The court had expressly advised the defendant of the dangers of testifying in a narrative fashion, but the defendant had elected to do so anyway.  (<u>Ibid</u>.)

Similarly, in <u>Gadson</u>, defense counsel informed the court that the defendant would be testifying against his advice and would call two witnesses.  The court advised the defendant he would be allowed to testify in a narrative form and noted the drawbacks of presenting such testimony.  The defendant then testified and presented the witnesses.  On appeal, he claimed counsel was ineffective for allowing him to so testify.  (<u>Gadson, supra</u>, 19 Cal.App.4th at p. 1709.)

The <u>Gadson</u> court rejected the defendant's arguments, noted that a defendant has an absolute right to testify over the objection of counsel but, citing <u>Nix v. Whiteside, supra</u>, 475 U.S. at page 171, also noted that a defense counsel's refusal to participate in the presentation of perjurious testimony from the accused does not deny the client effective assistance of counsel.  (<u>Gadson, supra</u>, 19 Cal.App.4th at p. 1710.)  After reviewing the <u>Guzman</u> case, the <u>Gadson</u> court found the narrative approach properly reconciled the competing interests; the defendant was able to testify on his own behalf and trial counsel refrained from actively participating in the presentation of false testimony.  This allowed the defendant the assistance of trial counsel without compromising the integrity of the adversarial system of justice.  (<u>Gadson, supra</u>, at p. 1711.)

> "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes both of the following: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.]  If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails."  (<u>People v. Rodrigues, supra</u>, 8 Cal.4th at p. 1126.)

Appellant contends defense counsel's insistence that his testimony was perjurious led to the use of the narrative approach, which then denied him effective assistance of counsel because

counsel avoided appellant's reports of abuse to explain his motive.  He also contends that defense counsel failed to argue appellant's testimony in addressing the trial court's refusal to instruct on duress and necessity as a defense.

But whether or not defense counsel's decision to use the narrative approach fell below an objective standard of reasonableness, appellant has failed to show a reasonable probability that, but for the use of the narrative approach, a determination more favorable to him would have been the result.  It was appellant who insisted that he testify, despite the fact that he was warned of various negative consequences.  While the prosecutor was allowed to cross-examine appellant and point out the weaknesses in his testimony, this would have happened even in a traditional question and answer testimony format.  And, as will be discussed in part 5., post, the facts did not call for instructions on duress or necessity defenses.  Any requests by counsel for those instructions would have been futile.

For the foregoing reasons, we conclude that appellant has failed to show he received ineffective assistance of counsel.

Neither was appellant denied the right to present a defense.  Quite literally, he was allowed to explain to the jury what occurred and why.  That his explanation did not provide a legal defense to the charges obviously does not establish a constitutional violation.

(Ex. A, pp. 12-14)

> ### 2.   Federal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

1        With the passage of the AEDPA, habeas relief may only be granted if the state-court decision

2    unreasonably applied this general <u>Strickland</u> standard for ineffective assistance.  <u>Knowles v.</u>

3    <u>Mirzayance</u>, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a

4    federal court believes the state court's determination under the <u>Strickland</u> standard "was incorrect but

5    whether that determination was unreasonable–a substantially higher threshold."  <u>Schriro v. Landrigan</u>,

6    550 U.S. 465, 473 (2007); <u>Knowles v. Mirzayance</u>, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the

7    AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state

8    court determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v.</u>

9    <u>Gentry</u>, 540 U.S. 1, 5 (2003). Moreover, because the <u>Strickland</u> standard is a general standard, a state

10   court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

11   <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was

12   unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway

13   courts have in reaching outcomes in case-by-case determinations").

14       Here, the state court identified the appropriate federal standard by applying <u>Strickland</u>.[4]  Thus,

15   the only issue is whether the state court's adjudication, i.e., that defense counsel's representation was

16   neither deficient nor prejudicial, was not contrary to or an unreasonable application of <u>Strickland</u>.  For

17   the reasons discussed below, the Court concludes that it was not.

18             3.   <u>Analysis</u>

19       The gravamen of Petitioner's claim is that in encouraging the use of the narrative approach to

20   testifying, defense counsel was ineffective because he did not use Petitioner's version of the facts in

21   argument, because the approach violated attorney-client privilege, and because that approach was the

22   result of a conflict of interest between Petitioner and counsel.  Closely following the reasoning of the

23   California Supreme Court in <u>Guzman</u>, which addressed each of these issues, the 5th DCA rejected

24   Petitioner's position in a reasoned decision.  The state court noted that, under <u>Nix v. Whiteside</u>, 475

25   U.S. 157 (1986), the United States Supreme Court had held that although a criminal defendant had an

26   absolute right to testify on his own behalf over the advice of counsel, counsel was not required to

27   participate in the presentation of perjured testimony.  <u>Nix</u> also held that counsel's refusal to participate

28   

[4]The 5th DCA cited <u>Williams v. Taylor,</u> 529 U.S. at 390-391, which, in turn, refers to <u>Strickland</u>.

1    in the defendant's narration did not deny the defendant the effective representation of counsel.

2    Relying on these authorities, the 5th DCA concluded that counsel's representation was not defective.

3    However, the court went on to conclude that, even if counsel's representation was defective for

4    allowing the narrative approach, Petitioner had not shown a reasonable probability that, but for the use

5    of the narrative approach, a result more favorable would have been the result.  Put simply, the 5th DCA

6    concluded that neither prong of <u>Strickland</u> had been met in this case.

7            Upon review, the Court concludes that the state court adjudication was not objectively

8    unreasonable.  Under <u>Nix</u>, the use of the narrative approach was not, per se, ineffective assistance.

9    Nor has Petitioner established that the use of that approach signaled to the jury that defense counsel

10   believed Petitioner was committing perjury.  Although it is true, as Petitioner contends, that the trial

11   court did not make an express finding that Petitioner's testimony would be perjurious, it does not

12   appear that <u>Nix</u> requires such an express finding.  Moreover, even applying the more stringent

13   standard of <u>Chapman v. California</u>, i.e., harmless beyond a reasonable doubt, the Court concludes that

14   the error was harmless.  Regardless of the form of the testimony, Petitioner had carte blanche to relate

15   the relevant events from his own perspective and in his own way.  The record does not suggest that,

16   had counsel been directing the testimony through his own questions, the jury would have heard a

17   significantly different set of facts that would have resulted in a more favorable outcome for Petitioner.

18   Indeed, given the evidence in this case, and the admissions from Petitioner's own mouth, it is difficult

19   to see how the jury, short of juror nullification, could have returned any other verdicts than the ones it

20   did.  Moreover, even assuming, arguendo, that Petitioner's decision to testify and counsel's decision

21   not to participate was evidence of a conflict of interest, Petitioner has not shown how such a conflict

22   of interest resulted in actual prejudice.  Accordingly, the claim should be rejected.

23           E.      <u>Instructional Error</u>

24           Petitioner's next contention is that the trial court erred in failing to instruct on the defense of

25   necessity and the lesser included offense of attempted voluntary manslaughter.  (Doc. 1, p. 19).  This

26   contention is without merit.

27                  1.      <u>The 5th DCA's Opinion</u>

28   The state appellate court rejected Petitioner's contention as follows:

34

Appellant contends that the trial court erred when it failed to instruct on the defense of necessity and the lesser included offense of attempted voluntary manslaughter. Specifically, appellant contends that he presented evidence that met all of the elements required for a necessity defense, and instructions on attempted voluntary manslaughter were required because his testimony provided evidence under a theory of heat of passion. We disagree.

**Procedural background**

During a hearing outside the presence of the jury, before appellant testified, defense counsel learned that appellant wanted to provide federal case citations to the court based on the defense of duress and necessity. The court stated that it could not perform research on those federal cases while the jury was waiting.

After appellant's testimony, defense counsel again asked that the court consider its ruling on the four inmate witnesses appellant wished to call. It is within the context of this motion that the court addressed appellant's contention that he had a necessity defense, stating:

> "[T]he court will note that while [appellant] might believe that he has touched on necessity of defense, the testimony is such that, one, the act charged as criminal must have been done to prevent a significant evil. Two, there must have been no adequate alternative to the commission of the act. Three, the harm caused by the act to the harm of avoiding [sic]. Four, the accused must entertain a good faith belief that his act was necessary to prevent the greater harm. Five, such belief must be objectively reasonable under all the circumstances. Six, the accused must not have ... substantially contributed to the creation of the emergency. [¶] In reviewing the evidence that has been tendered so far the Court finds that it is insufficient even on its face from what the belief of [appellant] was...."

During the next court hearing, the court and counsel discussed jury instructions. At this point, defense counsel indicated that he would not request necessity and duress instructions because the court had ruled that appellant could not call the four inmate witnesses to testify.

**Applicable law and analysis**

A trial court must instruct on general principles of law that are closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case, including defenses on which the defendant relies or which are not inconsistent with the defendant's theory of the case. (People v. Boyer (2006) 38 Cal.4th 412, 468–469; People v. Salas (2006) 37 Cal.4th 967, 982.) A court is not obligated to instruct on theories that lack substantial evidentiary support. (People v. Miceli (2002) 104 Cal.App.4th 256, 267.) "" "Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive."" [Citation.]" (People v. Benavides (2005) 35 Cal.4th 69, 102.) In determining whether an instruction is required, an appellate court does not determine the credibility of the defense evidence, but only whether there was evidence which, if credited by the jury, was sufficient to raise a reasonable doubt. (People v. Salas, supra, at p. 982; People v. Cole (2007) 156 Cal.App.4th 452, 483–484.) An appellate court independently reviews the question of whether the trial court erred by failing to instruct on defenses and lesser included offenses. (People v. Cook (2006) 39 Cal.4th 566, 596; People v. Oropeza (2007) 151 Cal.App.4th 73, 78.)

To justify an instruction on the defense of necessity, a defendant must present evidence sufficient to establish that:

> "'[he] [or she] violated the law (1) to prevent a significant and imminent evil, (2) with no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the

35

greater harm, (5) with such belief being objectively reasonable, and (6) under the circumstances in which [he] [or she] did not substantially contribute to the emergency. [Citations.]' [Citation.]"  (<u>People v. Galambos</u> (2002) 104 Cal.App.4th 1147, 1160.)

A defendant is not entitled to a claim of necessity unless, given the imminence of the threat, violation of the law was the only reasonable alternative.  (<u>United States v. Bailey</u> (1980) 444 U.S. 394, 410–411.)  If there was a reasonable alternative to violating the law, the defense will fail.  (<u>Ibid.</u>)  In other words, the necessity defense does not arise from a "choice" of several sources of action, but is instead based on a real emergency.  (<u>United States v. Dorrell</u> (9th Cir.1985) 758 F.2d 427, 431.)

Here, the facts presented do not support the defense of necessity. "[A] well-established central element [of the necessity defense] involves the emergency nature of the situation, i.e., the imminence of the greater harm which the illegal act seeks to prevent."  (<u>People v. Patrick</u> (1981) 126 Cal.App.3d 952, 960.)  The danger appellant testified to was not immediate or imminent. To the contrary, appellant testified that the abuse he suffered had been going on for months and he had been trying to resolve some of the issues through complaints and inmate appeals. On the day in question, appellant said he was "fed up" and "tired."  Evidence at trial was that the attack took place when the officers attempted to give him food through a port in his cell door.

Appellant's own testimony that he had filed numerous appeals relating to his treatment demonstrated that there were reasonable legal alternatives available to him. "'The necessity defense is very limited and depends on the lack of a legal alternative to committing the crime. It excuses criminal conduct if it is justified by a need to avoid an imminent peril and there is no time to resort to the legal authorities or such resort would be futile.' [Citation.]"  (<u>People v. Verlinde</u> (2002) 100 Cal.App.4th 1146, 1164.)  While appellant may have been frustrated with the complaint or appeals process, he did have legal recourse.

Finally, appellant's actions of thrusting a spear at the officers created a greater danger than the one he wished to avoid.

> "'As a matter of public policy, self-help by lawbreaking and violence cannot be countenanced where the alleged danger is merely speculative and the lawbreaker has made no attempt to enlist law enforcement on his side.  '[T]he defense of necessity is inappropriate where it would encourage rather than deter violence.  Violence justified in the name of preempting some future, necessarily speculative threat to life is the greater, not the lesser evil.' [Citation]."  (<u>People v. Miceli, supra</u>, 104 Cal.App.4th at p. 268.)

Because substantial evidence does not support the defense of necessity, we reject appellant's contention that instruction on that defense should have been given.

We also reject appellant's contention that the trial court erred in not instructing on attempted voluntary manslaughter based on a theory of sudden quarrel or heat of passion.  (See, e.g., <u>People v. Barton</u> (1995) 12 Cal.4th 186, 201–202 [attempted voluntary manslaughter a lesser included offense to attempted murder].)  "Voluntary manslaughter is a lesser included offense of murder when the requisite mental element of malice is negated by a sudden quarrel or heat of passion...."  (<u>People v. Gutierrez</u> (2003) 112 Cal.App.4th 704, 708.)  A trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present, but not when there is no evidence that the offense was less than that charged.  (<u>People v. Breverman</u> (1998) 19 Cal.4th 142, 148–149, 154–155.)

The provocation which incites a defendant to homicidal conduct must be caused by the victim or by conduct reasonably believed by the defendant to have been engaged in by the victim.

(People v. Manriquez (2005) 37 Cal.4th 547, 583.)  The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (Id. at pp. 583–584.)  "'Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.]"  (Id. at p. 584.)

But when "'sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter....' [Citation.]"  (People v. Breverman, supra, 19 Cal.4th at p. 163.)   And, "[h]eat of passion may not be based upon revenge."  (People v. Burnett (1993) 12 Cal.App.4th 469, 478;  see also People v. Fenenbock (1996) 46 Cal.App.4th 1688, 1704  ["Revenge does not qualify as a passion that will reduce a killing to manslaughter"].)

Appellant contends that his description of "severe, persistent, ignored, and uncorrected abuse" by the corrections officers could support an inference of "immediate and building heat of passion."  We disagree.  Appellant's contention that he had been mistreated for weeks by certain officers, not necessarily the ones he attacked, was insufficient as a matter of law to provoke a reasonable person of average disposition to attempt to kill Officer Hieng or Braswell.  Instead, appellant's testimony demonstrated the he acted out of revenge.  He himself testified that he thrust the spear at the officers because he was "fed up" and "tired."  Although appellant testified that he went "at it with [the officers]" and that they had "argue[d] over and over and over for minutes," there was no indication that had occurred near the time of the attack.  In fact, the evidence was that appellant's only interaction with the officers on the day of the attack was at the time they attempted to serve him his meal.

We therefore reject appellant's claim that the trial court should have instructed on the lesser included offense of attempted voluntary manslaughter.

(Ex. A, pp. 14-16)

## 2.   Federal Standard

The issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 68 (1991). ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"). Indeed, federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989). In addition, "the availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution." Sawyer v. Smith, 497 U.S. 227, 239 (1990), *quoting* Dugger v. Adams, 489 U.S. 401, 409 (1989).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would

have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. See Estelle v. McGuire, 502 U.S. at 72 & n. 4; Boyde v. California, 494 U.S. 370, 380, (1990). However, a determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. See Calderon v. Coleman, 525 U.S. 141, 146 (1998). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict before granting habeas relief. See id. at 146–47 (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

In determining whether instructional error warrants habeas relief, a habeas court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)); California v. Roy, 519 U.S. 2, 5 (1996) (challenge in habeas to the trial court's jury instructions is reviewed under the standard in Brecht v. Abrahamson, 507 U.S. at 637-- whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

In a criminal case, an evidentiary device must not undermine the fact-finder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt. County Court of Ulster County, N. Y. v. Allen, 442 U.S. 140, 156 (1979); In re Winship, 397 U.S. 358, 364 (1970). A permissive inference is one of the most common evidentiary devices, which allows, but does not require, the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant. Ulster, 442 U.S. at 157. "Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt'

standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." Id., 442 U.S. at 157; U.S. v. Warren, 25 F.3d 890, 897 (9th Cir. 1994); Sterling v. Roe, 2002 WL 826807 (N.D. Cal. 2002).  "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." Francis v. Franklin, 471 U.S. 307, 314-315 (1985).

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  The United States Supreme Court has held that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." Victor v. Nebraska, 511 U.S. 1, 5 (1994).  This standard reduces the chance that an innocent person will be conviction.  In re Winship, 397 U.S. at 362.  Winship does not require that every single fact upon which the jury relies be proven to a reasonable doubt.  Many facts not proven to that standard may, collectively, allow the jury to infer that an element of the crime is proven beyond a reasonable doubt.  To enforce Winship's rule, judges must instruct juries that they cannot return a guilty verdict unless the government has met this burden.  Cool v. United States, 409 U.S. 275, 278 (1972).  A jury conviction based upon an impermissibly low quantum of proof violates the jury trial guarantee of the Sixth Amendment.  Sullivan v. Louisiana, 508 U.S. 275, 278 (1993).  A judge can violate a defendant's rights by giving an instruction that undercuts the force of an otherwise proper beyond-a-reasonable-doubt instruction.  See, e.g., Cool, 409 U.S. at 102-103; Sandstrom v. Montana, 442 U.S. 510, 521 (1979).

When a jury instruction is susceptible to a reading that would render the verdict unconstitutional and another that would generate a proper verdict, the reviewing court considers the challenged instruction in light of the full jury charge and in the context of the entire trial.  See Naughten, 414 U.S. at 145-147(consider charge as whole); United States v. Park, 421 U.S. 658, 675 (1975)(consider context of whole trial).  The Court must then decide whether there is a reasonable likelihood that the jury applied the challenged instruction in an unconstitutional manner.  Estelle, 502

1 U.S. at 72.  A verdict remains valid if a jury instruction only tangentially undercut a proper beyond-a-

2 reasonable-doubt instruction.  Naughten, 414 U.S. at 149-150.

3         3.     Analysis

4        As to the instruction on the necessity defense, the 5th DCA, citing Bailey, concluded that the

5 facts of the case did not support such a defense under California law.  Noting that state law required

6 that the "necessity" stem from a "significant and imminent evil" with "no reasonable legal

7 alternative," the 5th DCA concluded that "the danger [Petitioner] testified to was not immediate or

8 imminent."   To the contrary, the court noted that Petitioner testified that he had been subjected to

9 mistreatment by the corrections officers for months and had been attempting to resolve those issues

10 through the inmate grievance process.  Petitioner's assault occurred as officers were attempting to give

11 him food through the prison door, a routine occurrence that did not involve any provocation or

12 imminent danger to Petitioner.  Additionally, the state court noted that other state law requirements,

13 e.g., not creating a greater danger than the one the petitioner wished to avoid and the lack of a legal

14 alternative to committing a crime, were also not met under these facts.  The court pointed out that

15 Petitioner still had avenues within the grievance process to pursue and that shoving a spear at the

16 officers could hardly qualify as a lesser danger than the one he wished to avoid.

17        As is obvious from the foregoing, this claim is squarely grounded in California law and, as

18 such, is not within the purview of a federal habeas court.  However, even were that not so, the state

19 court's adjudication, relying as it did on the absence of facts that would establish the state law

20 requirements for the necessity defense, was not objectively unreasonable.

21        Regarding the instruction on attempted voluntary manslaughter, Petitioner's theory for that

22 reduced level of culpability is a sudden quarrel or heat of passion, as those terms are defined in

23 California law.  Again, this issue raises only a question of state law not cognizable under federal

24 habeas review.  However, the 5th DCA concluded that Petitioner's evidence that he had been

25 mistreated for weeks by certain correctional officers, not necessarily the ones he attacked, was

26 "insufficient as a matter of law" to support a defense theory of a sudden quarrel or heat of passion.  As

27 the state court noted, Petitioner himself testified that he was "fed up" and "tired" of the mistreatment.

28 The trial evidence indicated that, prior to the incident, the officers had merely approached Petitioner's

cell to feed him and had not engaged in any kind of provocation.  That Petitioner might be frustrated and "fed up" with what he perceived to be mistreatment may be understandable; however, it did not support a claim that a sudden quarrel or heat of passion sparked the attack.  The 5th DCA's conclusion in this regard is reasonable and justified under the evidence.  Accordingly, there was no evidentiary basis for a state law defense of attempted voluntary manslaughter, and, hence, the trial court's refusal to so instruct the jury cannot be considered error, let alone constitutional error.

Here, as a whole, the instructions adequately instructed the jury regarding Petitioner's defense theories and the appropriate charges. The jury is presumed to have followed those instructions. Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000). Accordingly, the state court decision is not contrary to nor an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d).

F.   Cumulative Error

Next, Petitioner contends that the preceding allegations of error cumulatively require habeas relief.

1.   The 5th DCA's Opinion

In rejecting Petitioner's contention, the 5th DCA reasoned as follows:

> Appellant argues that the cumulative impact of the alleged errors deprived him of a fair trial.  We disagree.  We have either rejected appellant's claims or found any errors, assumed or not, to be not prejudicial on an individual basis.  Viewing the errors as a whole, we conclude that the errors do not warrant reversal of the judgment.  (People v. Stitely (2005) 35 Cal.4th 514, 560.)

(Ex. A, p. 16)

2.   Federal Standard And Analysis

The cumulative prejudicial effect of multiple trial errors must be considered in determining whether habeas relief is warranted.  28 U.S.C. § 2254.  Phillips v. Woodford, 267 F.3d 966, 985 (9th Cir. 2001).  Here, however, as discussed above, there are no constitutional errors to accumulate.  See Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997)(per curiam).  In analyzing prejudice in a case in which it is questionable whether any "single trial error examined in isolation is sufficiently prejudicial to warrant reversal," the Ninth Circuit has recognized the important of considering the "cumulative effect of multiple errors" and not simply conducting a "balkanized, issue-by-issue

harmless error review." United States v. Frederick, 78 F.3d 1370, 1381 (9ᵗʰ Cir. 1996); see also

Whelchel v. Washington, 232 F.3d 1197, 1124 (9ᵗʰ Cir. 2000)(noting that cumulative error applies on

habeas review); Matlock v. Rose, 731 F.2d 1236, 1244 (6ᵗʰ Cir. 1984)("Errors that might not be so

prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively

produce a trial setting that is fundamentally unfair.").

"Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their

cumulative effect prejudiced the defendant." Ceja v. Stewart, 97 F. 3d 1246, 1254 (9ᵗʰ Cir. 1996),

citing Mak v. Blodgett, 970 F.2d 614, 622 (9ᵗʰ Cir. 1992). "Although no single alleged error may

warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due

process right to a fair trial." Karis v. Calderon, 283 F.3d 1117, 1132 (9ᵗʰ Cir. 2002). However, the

Ninth Circuit has also recognized that where there is no single constitutional error, nothing can

accumulate to the level of a constitutional violation. See Rup v. Wood, 93 F.3d 1434, 1445 (9ᵗʰ Cir.

1996). Thus, no error occurred and as a consequence, there can be no cumulative error.

G.     Sentencing Error

Petitioner next contends that the state court erred in imposing punishment based upon a

juvenile violation that was sustained without a jury trial or waiver thereof.  (Doc. 1, p. 20).  This

contention is also without merit.[5]

1.     The 5ᵗʰ DCA's Opinion

The 5ᵗʰ DCA rejected Petitioner's claim as follows:

Appellant next claims his 1985 juvenile adjudication should not qualify as a strike under the
three strikes law because as a juvenile he was not entitled to a jury trial.

The recent case of People v. Nguyen (2009) 46 Cal.4th 1007 addressed the question whether a
juvenile adjudication could be used as a strike under California's three strikes law.  The issue
presented was whether juvenile adjudications could constitutionally be used as strikes given
that juveniles are not entitled to a jury trial.  Our Supreme Court held that such adjudications
could be used as strikes and that such use did not violate federal constitutional principles.
Appellant recognizes this court is bound by the decisions of the Supreme Court.  (Auto Equity
Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)  But appellant makes the argument to
preserve any right he might have to address the issue on review of his sentence by a federal
court.

---

[5] As mentioned previously, in state court Petitioner raised numerous sentencing errors and in its first decision, the 5ᵗʰ DCA
acknowledged that some errors had been made and ordered them corrected upon remand.  In the instant petition, Petitioner
raises only the issue related to the use of his juvenile conviction, an issue that was not the subject of error in state court,

1    We have no authority to revisit the question of the applicability of the three strikes law to
2    qualified adjudications, and therefore reject appellant's claim.

3    (Ex. A, p. 18)

4              2.     Federal Standard

5         Issues of state law sentencing errors generally are not cognizable on federal habeas review,

6    unless the petitioner claims a deprivation of due process or equal protection due to the misapplication

7    of the sentencing law. See Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993), cert. denied, 115

8    S.Ct 290 (1994); Featherstone v. Estelle, 948 F.2d 1497, 1500 (9th Cir. 1991); Estelle v. McGuire, 502

9    U.S. at 68 (holding that "it is not the province of a federal habeas court to reexamine state court

10   determinations on state law questions"); Miller v. Vasquez, 868 F. 2d 1116, 1118-19 (9th Cir. 1989)

11   (refusing to address sentence enhancement claim).

12        A criminal defendant is entitled to due process at sentencing.  Gardner v. Florida, 430 U.S.

13   349, 358, 979 S. Ct. 1197 (1977).  Federal courts must defer to a state court's interpretation of state

14   sentencing laws.  Bueno v. Hallahan, 998 F. 2d 86, 88 (9th Cir. 1993).  "Absent a showing of

15   fundamental unfairness," a state court's misapplication of its own sentencing laws does not justify

16   federal habeas relief."  Christian v. Rhode, 41 F. 3d 461, 469 (9th Cir. 1994).  As a threshold matter,

17   the court must determine whether Petitioner has alleged that his sentence is fundamentally unfair.

18        A showing of fundamental unfairness has been found under two circumstances.  First, where a

19   state court imposed a sentence in excess of state law.  (Walker v. Endell, 850 F. 2d 470, 476 (9th Cir.

20   19970; see also, Marzano v. Kincheloe, 915 F.2d 549, 552 (9th Cir. 1990) (guilty plea does not permit

21   state court to impose a sentence in excess of state law despite agreement of defendant to sentence).

22   Second, where a state court enhanced a sentence based on materially false or unreliable information or

23   based on a conviction infected by constitutional error.  See United States v. Hanna, 49 F.3d 572, 577

24   (9th Cir. 1995); Walker, 850 F. 2d at 477.  Generally, a federal habeas court will not review a state

25   sentence that is within statutory limits. Id. at 476.

26              3.     Analysis

27        Respondent correctly contends that this is solely an issue of state law. The petition itself

28   acknowledges "the contrary [state] decision in People v. Nguyen,"  Petitioner argued in his petition for

review that using a conviction based on charges for which Petitioner had no right to a jury trial and did not waive a jury trial, violated his federal constitutional rights.  (Doc. 1, p. 38)  The Court agrees with Respondent that this is a state law issue.

As mentioned previously, not only is federal habeas review limited to issues of federal constitutional law, rather than state law, but, additionally, this Court is *bound* by the state court's interpretation of its own laws.  In this circumstance, the relevant question is whether a juvenile conviction may be used to enhance a later adult sentence under California law.  <u>Nguyen</u> affirmatively answers this question and this Court is accordingly bound by that interpretation of California criminal and sentencing law.  Petitioner's contention that such an interpretation violates his federal constitutional rights notwithstanding, this Court simply has no habeas jurisdiction to dictate to the State of California how it should interpret its own laws.  Accordingly, habeas relief for this claim should be denied.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1) be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  **Within 21 days** after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within 10 days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).

///

///

///

///

1    The parties are advised that failure to file objections within the specified time may waive the

2    right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3

4    IT IS SO ORDERED.

5        Dated:   **June 12, 2016**                        **/s/ Jennifer L. Thurston**

6                                                UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28